MINISTRY OF DEFENSE OF the IS-LAMIC REPUBLIC OF IRAN, Plaintiff–Appellee/Cross–Appellant,

v.

GOULD INC., Gould Marketing, Inc., Hoffman Export Corporation, and Gould International, Inc., Defendants–Appellants/Cross–Appellees.

Nos. 88–5879, 88–5881.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 9, 1989.

Decided Oct. 23, 1989.

Marc S. Palay, Jones, Day, Reavis & Pogue, Washington, D.C., for defendants-appellants/cross-appellees.

Richard E.M. Brakefield, Long Beach, Cal., Anthony Van Patten of Arndt & Van Patten, Los Angeles, Cal., for plaintiff-appellee/cross-appellant.

Michael F. Hertz, Joan E. Hartman, Attys., U.S. Dept. of Justice, filed a brief for the U.S. as amicus curiae, Abraham D. Sofaer, Legal Adviser to the U.S. Dept. of State, Ronald J. Bettauer, Asst. Legal Adviser, Sean D. Murphy, Atty. Adviser, U.S. Dept. of State, of counsel.

Before CANBY, WIGGINS and O'SCANNLAIN, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

We are asked to determine whether an award against an American corporation entered by the Iran–United States Claims Tribunal can be enforced in federal court. The district court ruled that subject matter jurisdiction to enforce such award vests under the New York Convention and the Federal Arbitration Act. We agree.

I

A clear understanding of this dispute requires some examination of recent Iranian and American history. The former Shah of Iran, Mohammed Reza Pahlavi, ruled the Imperial Republic of Iran from 1953, when he assumed control of the government, until shortly before his death in 1979. Unrest developed and intensified in Iran during the Shah's rule. Led by conservative Moslem protests, the unrest eventually began to erupt in the late 1970s. In response, the Shah in 1978 declared martial law in twelve cities and set up a military government to deal with striking oil workers. Thereafter, he appointed Prime Minister Shahpur Bakhtiar to head a regency council and left the country, never to return, on January 16, 1979.

Meanwhile, exiled religious leader Ayatollah Ruhollah Khomeini named a provisional government council; he returned to Iran shortly after the Shah's departure. On February 11, less than two weeks after his return, Khomeini's supporters routed the imperial Guard, bringing about the collapse of Bakhtiar's government. Khomeini emerged victorious in the struggle to fill in the resultant power vacuum, as the Moslem clergy oversaw the drafting of an Islamic Constitution that vested final authority to rule in the Ayatollah and established the Islamic Republic of Iran.

Rampant unrest in Iran continued, and on November 4, 1979, Iranian militants seized the United States Embassy in Tehran and took as hostages members of the United States diplomatic corps stationed there. The hostage takers vowed to retain control of the fifty-two United States nationals and the embassy until the deposed Shah was returned to Iran. The United

States retaliated with a series of actions. First, on November 14, President Carter issued an Executive Order declaring a national emergency and calling for the freezing of some $12 billion worth of Iranian assets in the United States and abroad. Exec. Order No. 12,170, 3 C.F.R. 457 (1980), note following 50 U.S.C. § 1701, 44 Fed. Reg. 65.729 (1979). In April 1980, the United States failed in an attempted military rescue operation and broke off diplomatic relations with Iran. The impasse dragged on even as the Shah died in Egypt in July. Finally, on January 19, 1981, more than one year after the storming of the American embassy in Tehran, representatives of the United States and Iran, through the intermediary Government of Algeria, reached an agreement that provided for the release of the American hostages. The agreement, known as the Algiers Accords ("the Accords"), comprised principally two documents: The Declaration of the Democratic and Popular Republic of Algeria (Jan. 19, 1981), *reprinted in* Dept. of State Bull. No. 2047, Feb. 1981, at 1 ("General Declaration") and the Declaration of the Government of the Democratic and Popular Republic of Algeria Concerning the Settlement of Claims by the Government of the United States of America and the Government of Islamic Republic of Iran (Jan. 19, 1981), *reprinted in* Dept. of State Bull. No. 2047, Feb. 1981 at 3 ("Claims Settlement Declaration").

The General Declaration set forth two principles that encompass the basic thrust of the agreement and which provide, in relevant part, as follows:

A.... [T]he United States will restore the financial position of Iran, in so far as possible, to that which existed prior to November 14, 1979....

[T]he United States commits itself to ensure the mobility and free transfer of all Iranian assets within its jurisdiction....

B. It is the purpose of both parties ... to terminate all litigation as between the Government of each party and the nationals of the other, and to bring about the settlement and termination of all such claims through binding arbitration.... [T]he United States agrees to terminate all legal proceedings in United States courts involving claims of United States persons and institutions against Iran and its state enterprises, to nullify all attachments and judgments obtained therein, to prohibit all further litigation based on such claims, and to bring about the termination of such claims through binding arbitration.

Dept. of State Bull. at 2.

The General Declaration also laid out procedural details concerning the return of Iranian assets and United States nationals. Basically, it provided that once the Algerian Central Bank certified to an escrow bank in which the Iranian assets would be held that all 52 U.S. nationals had departed Iran safely, the escrow bank would transfer most of those assets back to Iran. The escrow bank would then hold the balance of the assets in a "Security Account" for the purpose of allowing U.S. nationals who prevailed on claims against Iran to satisfy their awards.[1]

The Claims Settlement Declaration set up the mechanism by which nationals of either country could present their claims against the government of the other. It established the Iran–United States Claims Tribunal, in which it vested jurisdiction over such claims and any counterclaims arising out of the same transaction. It also provided the details concerning the operation of the Tribunal.

The same day that Warren Christopher, Deputy Secretary of State, initialed the Accords to signal United States assent to their terms, President Carter issued a series of Executive Orders providing for their implementation. Exec. Orders No. 12,276–85, 46 Fed.Reg. 7913–32 (Jan. 19, 1981).[2]

---

1. The parties agreed to use the Central Bank of the Netherlands (De Nederlandsche Bank) for maintaining the Security Account.

2. These Executive Orders were later implemented by amendments to the Iranian Assets Control Regulations, 31 C.F.R. §§ 535.101 *et seq.* (1981). *See* 46 Fed.Reg. 14,330–37 (Feb. 26, 1981).

The next day, President Reagan was inaugurated, and shortly thereafter, on February 24, 1981, he issued an Executive Order ratifying the implementing Orders President Carter had issued. Exec. Order 12,-294, Fed.Reg. 14,111 (Feb. 24, 1981). President Reagan's Order also "suspended" all claims within the jurisdiction of the Tribunal, provided that such claims were of no legal effect in a United States court, and mandated that the Tribunal's determination on the merits of any claim validly before it "shall operate as a final resolution and discharge of the claim for all purposes." *Id.* The Supreme Court upheld the authority of the President to issue these Executive Orders. *Dames & Moore v. Regan,* 453 U.S. 654, 674, 686, 101 S.Ct. 2972, 2983, 2990, 69 L.Ed.2d 918 (1981).

In the early 1970s, when somewhat more tranquil relations prevailed between the United States and Iran, the Ministry of War of the Imperial Government of Iran and Hoffman Electric Corporation entered into two contracts whereby Hoffman agreed to provide and install certain military equipment. The Iranian revolution disrupted progress payments and performance called for under the agreements. In early 1980, Hoffman filed an action against Iran for breach of contract in the United States District Court for the Central District of California, eventually obtaining a writ of attachment on Iranian assets held in the United States to satisfy its claim.

*See Security Pacific Nat'l Bank v. Government & State of Iran,* 513 F.Supp. 864, 866 (C.D.Cal.1981). After President Reagan issued the Executive Order suspending all claims in U.S. courts, however, the district court vacated the attachment and dismissed without prejudice Hoffman's action "subject to the right of any party to move to reopen the action at any time prior to the entry and satisfaction of a judgment of the Arbitral Tribunal ... on the grounds that the settlement has failed of its essential purpose." *Id.* at 884.

Hoffman in turn filed Claims 49 and 50 with the Tribunal at the Hague, seeking damages from Iran for breach of contract. In response, in a series of actions over the next year, Iran filed Statements of Defense to both of Hoffman's claims, and pursuant to Art. II, sec. 1 of the Claims Settlement Declaration, filed counterclaims for breach of contract in which it sought in excess of $80 million against Hoffman.[3] By way of counterclaim, Iran also sought to obtain certain military radio equipment in Hoffman's possession.[4] During the pendency of the proceedings before the Tribunal, Hoffman was merged into Gould Marketing, Inc. ("Gould"), a wholly-owned subsidiary of Gould International, Inc. ("GII").[5]

The Tribunal eventually issued a consolidated final award in Claims 49 and 50 in which it ruled that Gould was to pay $3.6 million and return the military radio equipment to Iran.[6] The monetary award in

**3.** Hoffman argued to the Tribunal that this section of the Declaration only allows Iran to use a counterclaim as a means to obtain a setoff, and that is does not give the Tribunal jurisdiction to render a positive award in favor of Iran. The Tribunal rejected this argument in an interlocutory award in Case No. 49. 3 Iran–U.S.C.T.R. at 151–52.

**4.** Because this equipment falls within the items on the United States Munitions List, domestic export restrictions forbade its exportation to Iran. Items on the Munitions List may not be exported to any country that the Secretary of State has determined repeatedly provides support for acts of international terrorism. 22 U.S.C. § 2780. The Secretary of State determined that Iran fit this definition on January 23, 1984. 49 Fed.Reg. 2836 (1984).

Even prior to the Secretary's determination, the Office of Munitions Control refused to grant

Gould's application for a license to enable it to export this equipment to Iran in 1981.

**5.** A factual dispute apparently exists as to which appellees are actually legitimate successors in interest to Hoffman; the resolution of that issue is not necessary or appropriate to decide on this interlocutory appeal. Because the Tribunal substituted Gould Marketing, Inc. as the claimant in these cases, hereinafter we will refer to appellee[s] simply as "Gould."

**6.** The Tribunal's final award reads in relevant part as follows:

The Claimant, Gould Marketing, Inc., is obligated to pay the Respondent, Ministry of Defence of the Islamic Republic of Iran, U.S. $3,640,247.13.

The Counterclaims are dismissed on the merits.

. . . .

favor of Iran constituted a net accounting of the amounts the Tribunal found that Iran owed Gould under Claim No. 49 and that Gould owed Iran under the counterclaim to Claim No. 49.

Unlike the provision creating the Security Account at the escrow bank, the funds of which are to be used for the sole purpose of securing the payment of claims *against* Iran, the Accords provide no specific vehicle for the enforcement of awards *in favor of* Iran. Thus, following the Tribunal's judgment, Iran sought a ruling that the United States government was required to satisfy awards issued under the Accords in Iran's favor by filing a "Request for Interpretation" with the Full Tribunal, pursuant to Art. II(3) of the Claims Settlement Declaration. Request of the Islamic Republic of Iran for Interpretation, Iran–U.S. Claims Tribunal, Case A/21, July 1985, *reprinted in* Iranian Assets Lit.Rep. 10,897, 10,901–02 (1985).

The Full Tribunal determined that the United States had no such specific obligation under the Accords. *Islamic Republic of Iran v. United States*, Case No. A/21, 14 Iran–U.S.C.T.R. at 330. Nonetheless, the Tribunal went on to state that it considered the United States to have a more general obligation to provide some sort of enforcement mechanism for such awards "within its national jurisdiction."

> The Tribunal has no authority under the Algiers Declarations to prescribe the means by which each of the States provides for ... enforcement. Certainly, if no enforcement procedure were available in a State Party, or if recourse to such procedure were eventually to result in a refusal to implement Tribunal awards, or unduly delay their enforcement, this would violate the State's obligations under the Algiers Declarations. It is therefore incumbent on each State Party to provide some procedure or mechanism whereby enforcement may be obtained within its national jurisdiction, and to ensure that the successful Party has access thereto.

*Id.* at 331.

## II

The Tribunal's ruling led to the filing of the current action in the United States District Court for the Central District of California, in which Iran seeks confirmation and enforcement of its award against Gould. Gould responded to the petition by filing a motion to dismiss on the ground that the district court lacks subject matter jurisdiction to decide such a matter. Gould set forth three grounds in support of its motion. First, it argued that because Iran is not recognized formally by the United States government, neither it nor any of its instrumentalities may maintain any action in a United States Court.[7] Second, it argued that because the Algiers Accords are not self-executing, no federal question exists over which the district court can assert jurisdiction. Third, it argued that because the Tribunal proceedings leading up to the award in favor of Iran did not comply with certain terms of the New York Convention, the district court improperly exercised jurisdiction under 9 U.S.C. § 203.

The district court granted Gould's motion in part and denied it in part. The court held that it did not possess federal question jurisdiction over the matter, stating that it considered itself to be bound by language of this court concerning the nonself-executing nature of the Accords in *Islamic Republic of Iran v. Boeing Co.*, 771 F.2d 1279

---

The Claimant, Gould Marketing, Inc., is obligated to make available to the Respondent, Ministry of Defence of the Islamic Republic of Iran, the 21 VCS radios, the two ARC radios, the teleprinter, the one front panel assembly and the miscellaneous equipment and materials acquired under the contract involved in case number 50 which were not returned for credit or economically disposed of and therefore belong to the Respondent.
6 Iran–U.S.C.T.R. at 288.

7. The district court, relying on the unequivocal Statement of Interest of the United States Government in support of access of Iran to the federal district courts for the purpose of enforcing Tribunal Awards, found this argument unpersuasive. *Ministry of Defense v. Gould, Inc.*, No. 87–03673 (C.D.Cal. Jan. 14, 1988) (order denying Gould's motion to dismiss). The issue was not certified under section 1292(b) and thus does not form a portion of the basis of this interlocutory appeal.

(9th Cir.1985). Nonetheless, the court held that it did have jurisdiction over the petition under section 203, as a consequence of its ruling that the Tribunal's award satisfied the requirements of the New York Convention.

Both parties moved for certification of an immediate appeal to this court. Gould moved for interlocutory review of the issue of whether the district court properly could enforce the Tribunal award under the New York Convention; Iran moved for interlocutory review of the issue of whether the Algiers Accords are self-executing. The district court granted both motions, and issued an order certifying both questions for an immediate appeal.

We agreed to hear these interlocutory appeals pursuant to 28 U.S.C. § 1292(b).

### III.

In New York in 1958, the United Nations facilitated the creation of an international agreement providing for enforcement of foreign arbitral awards. Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 21 U.S.T. 2517, T.I.A.S. No. 6997, 330 U.N.T.S. 38 ("the New York Convention" or "the Convention"). Party–States to the Convention agree to "recognize arbitral awards as binding and enforce them in accordance with [their own] rules of procedure." New York Convention, Art. III. The United States became a party to the Convention in 1970, and Congress soon after enacted legislation implementing the provisions of the Convention into domestic law, codified as Chapter II of the Federal Arbitration Act, 9 U.S.C. sections 201–208.

As part of this legislation, Congress vested federal district courts with original jurisdiction over any action or proceeding "falling under the Convention," as such an action is "deemed to arise under the laws and treaties of the United States." 9 U.S.C. § 203. The starting point for our interpretation is a supplementary statutory provision which provides that an "arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, *falls under* the Convention." 9 U.S.C. § 202 (emphasis supplied). The provision goes on to except from the definition of "falls under" certain awards made pursuant to a domestic legal relationship which have no foreign nexus. *Id.*

Under the plain meaning of the statute then, three basic requirements exist for jurisdiction to be conferred upon the district court: the award (1) must arise out of a legal relationship (2) which is commercial in nature and (3) which is not entirely domestic in scope. These three conditions are clearly satisfied here.

Congress has provided that the New York Convention, with minor modifications, shall be enforced in United States Courts. 9 U.S.C. § 201. Article I discusses the scope of the Convention, stating that it "shall apply to the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought, and arising out of differences between persons, whether physical or legal ... [and those awards] not considered as domestic awards in the State where their recognition and enforcement are sought." Article I, ¶ 1. The Convention defines "arbitral awards" to include those "made by permanent arbitral bodies." Article I, ¶ 2. The United States imposes an additional related condition on the award: it must be "made in the territory of another Contracting State." 21 U.S.T. 2566, *reprinted* at notes following 9 U.S.C.A. § 201. Because of the "shall apply" language of Article I, we read these requirements into the jurisdictional mandate of section 203.

The Tribunal's award satisfies these requirements as well. That is, the Tribunal sits at The Hague, which is in the Netherlands, which is a contracting State. In addition, the award is obviously not domestic in nature because Iran is one of the parties to the agreement.

### IV

Gould sets forth two basic arguments to support its position that the district court

lacks jurisdiction over the enforcement of the award under the Convention. First, relying on language in Articles II and IV, Gould argues that the Convention applies, and hence, jurisdiction to enforce exists, only as to those awards that derive from an arbitral agreement in writing to which the parties voluntarily submitted. It contends that the Accords documents themselves do not satisfy this requirement. Second, Gould argues that the arbitral award was not arrived at in compliance with the Convention's supposed requirement that the proceedings be subject to a "national" arbitration law.

## A

■ The Convention does make several pronouncements concerning the form of the agreement leading up to the award. For example, it places upon each contracting State the obligation to recognize an arbitral agreement in writing between the parties. Convention, Article II, ¶ 1.[8] In addition, the party seeking enforcement must file with the court "[t]he original agreement referred to in article II … or a duly certified copy thereof." Convention, Article IV, ¶ 1(b). These provisions do indeed seem to indicate that the award referred to in section 203 emanate from a written agreement.

We construe the Accords themselves as representing the written agreement so required, on the strength of the President's authority to settle claims on behalf of United States nationals through international agreements. "[I]nternational agreements settling claims by nationals of one state against the government of another 'are established international practice reflecting traditional international theory.'" *Dames & Moore*, 453 U.S. at 679, 101 S.Ct. at 2986 (quoting L. Henkin, Foreign Affairs & the Constitution (1972)). More specifically, the Court in *Dames & Moore* held that the President possessed the authority to nullify attachments and order the transfer of Iranian assets, *id.* at 674, 101 S.Ct. at 2983–84, and to suspend claims of American citizens against Iran. *Id.* at 686, 101 S.Ct. at 2990.

Gould contends that *Dames & Moore* should be more narrowly construed. Indeed, the Court itself chose to "re-emphasize the narrowness of our decision. We do not decide that the President possesses plenary power to settle claims, even as against foreign governmental entities." *Id.* at 688, 101 S.Ct. at 2991. Nevertheless, the Court went on to make clear that its holding extends broadly enough to encompass the authority of the President to settle claims under the facts before us. *Id.* Thus, because the President acted within his authority on behalf of United States citizens, the real question is not whether Gould entered into a written agreement to submit its claims against Iran to arbitration, but whether the President—acting on behalf of Gould—entered into such an agreement. The answer is clearly yes. Deputy Secretary of State Warren Christopher initialed the Accords in his role as an agent for the President; and thus, the requirements of Article II, ¶ 1 are satisfied.[9]

---

**8.** The full text of the paragraph reads as follows:
1. Each Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any difference which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration.
New York Convention, Article II ¶ 1.

**9.** Gould argues that the Convention envisages that the parties themselves will have entered the requisite written agreement to arbitrate. It relies on the history of negotiations leading to the Convention. *See* Quigley, *Accession by the United States to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards,* 70 Yale L.J. 1049, 1061 n. 54 ("It

is definitely understood, however, that the Convention applies only to awards resulting from arbitrations to which the parties have submitted voluntarily. If the arbitration were conducted by a permanent body to which the parties are obligated to refer their disputes regardless of their will, the proceedings are judicial rather than arbitral in character and the resulting award consequently could not come within the purview of the Convention") (quoting the Official Report of the United States Delegation to the Convention).

The quotation lends some support to Gould's view, but we nevertheless conclude that the Convention does not preclude the United States from entering an agreement on behalf of its nationals, as authorized by *Dames & Moore.* We do not view the arbitration as having been

In addition, the Final Tribunal Rules of Procedure state that "[t]he Claims Settlement Declaration constitutes an agreement in writing by Iran and the United States, on their own behalfs *and on behalf of their nationals* submitting to arbitration within the framework of the Algiers Declarations and in accordance with the Tribunal Rules." Final Tribunal Rule of Procedure 1.3 (emphasis supplied).[10]

Gould urges further that the only court to have considered the issue, the High Court of England, ruled that the Accords do not satisfy the "agreement in writing" standard of the Convention. *See Dallal v. Bank Mellat,* 1 All E.R. 239 (Q.B.1986). This is a mischaracterization of the High Court's opinion, however. First, the High Court in *Dallal* engaged in a ruling on the merits of whether a Tribunal award barred a proceeding in English courts as res judicata based on the same claim; the Court was not ruling on whether it possessed jurisdiction under the Convention. Second, the Court's analysis focused on an evaluation of whether the "conduct of the parties in the arbitration and, in particular, their written pleadings"—not, as argued here, the Accords themselves—constituted the "agreement in writing." *Id.* Finally, the Court's entire discussion appears to be dictum. *"If it were necessary* for me to decide the question at this stage, *I would decide* that the proceedings were a nullity in Dutch law." *Id.* (emphasis supplied).

Moreover, even if the United States government lacked authority to enter into the agreement in writing required under the Convention, we find persuasive the argument that Gould, in filing its claim and arbitrating it before the Tribunal, "rati-

fied" the actions of the United States. *See id.* at 254; Lewis, "What Goes Around Comes Around: Can Iran Enforce Awards of the Iran–U.S. Claims Tribunal in the United States?," 26 Colum.J.Transnat'l L. 515, 546 (1988).

## B

The second basic argument Gould makes is premised on language contained in Article V, which lists the defenses available to the party against whom enforcement of a Tribunal Award is sought.[11] Gould asserts that these defensive provisions contain an implicit requirement that the Convention applies only to arbitral awards made in accordance with the national arbitration law of a Party State. In particular, Gould seeks to buttress its position by looking to Article V, ¶ 1(e), which provides that the party against whom enforcement is sought may establish that enforcement should not be granted if it can show that "the award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or *under the law of which,* that award was made." New York Convention, Article V, ¶ 1(e) (emphasis supplied). Gould argues that this subparagraph would be rendered devoid of practical meaning if the Convention calls for the recognition of awards other than those which are made under a foreign municipal law. Thus, it concludes that because the Tribunal's award in favor of Iran was a creature of international law, and not national law, it does not "fall under" the Convention pursuant to section 203.

---

converted from a consensual to a judicial process. The process is not comparable to one in which a nation with a planned economy requires all disputes to be settled by a state arbitral tribunal, a prospect that concerned some of the delegates negotiating the Convention. *See* Notes & Comments, *Fifty-third annual Meeting of the Society,* 53 Am.J.Int'l L. 396, 416 & n. 20 (1959).

**10.** Although these rules were not finalized until May 3, 1983, some time after Hoffman filed its claim with the Tribunal, they likely constitute specific memorializations of the agreement that

was reached at the time the United States assented to the Accords.

**11.** A party seeking to avoid enforcement is limited to the seven defenses as listed in article V of the Convention, and also has the burden of proof to establish any defense. *Parsons & Whittemore Overseas Co. v. Societe Generale de l'Industrie du Papier (Rakta),* 508 F.2d 969, 973 (2d Cir.1974); *Biotronik Messund Therapiegeraete GmbH & Co. v. Medford Medical Instrument Co.,* 415 F.Supp. 133, 136 (D.N.J.1976). Courts construe such defenses to enforcement narrowly. *Parsons & Whittemore,* 508 F.2d at 973–77.

Section 203 does not contain a separate jurisdictional requirement that the award be rendered subject to a "national law." Language pertaining to the "choice of law" issue is not mentioned, or even alluded to, in Article I, which lays out the Convention's scope of applicability. In addition, although it is a close question, the fairest reading of Convention itself appears to be that it applies to the enforcement of non-national awards. Indeed, a Dutch court has so held. *See Societe Europeenne d'Etudes et d'Enterprises v. Socialist Federal Republic of Yugoslavia*, HR (Hoge Raad der Nederlanden) NJ 74, 361 (1974) (hereinafter "*Societe*").[12] In *Societe*, the Hoge Raad, the highest court of the Netherlands, reversed the Court of The Hague, which had ruled that the Dutch trial court erred in recognizing an arbitral award that was not issued according to the law of Switzerland. The Hoge Raad held that the strictures of Article V do not come into effect unless and until "the party against whom the award is invoked furnishes proof of the existence of one of the impediments specified under (a) to (e) [in Article V]." *Id.* at 1006–07. "The relationship between the award and the law of a particular country need only be examined in the framework of an investigation to be carried out following a plea that the impediments mentioned in Article V(1) exist ... in respect of which questions may arise which can be answered only with reference to the law of a particular country." *Id.*

In addition, allowing the parties to un-tether themselves from a pre-existing "national law" still leaves certain safe-guards in place to guard against enforcement of an otherwise unfair arbitration award. The Convention contains several due process protections requiring notice and the opportunity to be heard as well as a defense to guard against enforcement of awards con-trary to public policy. Article V, ¶¶ 1(b), 2(b). Also, while the Tribunal at times may function as a forum for the resolution of interstate disputes, *e.g.*, when it is called upon to render an opinion as between the United States and Iran under Article II, § 2 of the Claims Settlement Declaration, it primarily is concerned with the resolution of private law rights based on contractual arrangements relating to the provision of goods and services. Article II, ¶ 1. It certainly has served this latter function in this case.

Finally, as they are laid out, the defenses seem to apply to arbitral awards made pur-suant to municipal domestic law *or* those made pursuant to law of the parties' choos-ing, as in this case. In particular, Article V ¶ 1(d) allows a party against whom enforce-ment is sought to defend against enforce-ment if "the arbitral procedure was not in accordance with the agreement of the par-ties, *or*, failing such agreement, was not in accordance with the law of the country where the arbitration took place" (empha-sis supplied).

Although this language seems to be at loggerheads with that of Article V ¶ 1(e) concerning "the country ... under the law of which, [the] award was made," it is possible to reconcile the two provisions in accordance with an interpretation that holds that the Convention applies to "non-national law" awards. That is, if the par-ties choose not to have their arbitration governed by a "national law," then the losing party simply cannot avail itself of certain of the defenses in subparagraphs (a) and (e).

Thus, we conclude that an award need not be made "under a national law" for a court to entertain jurisdiction over its en-forcement pursuant to the Convention.[13]

---

12. *See also* Lewis, "What Goes Around Comes Around: Can Iran Enforce Awards of the Iran-U.S. Claims Tribunal in the United States?," 26 Colum.J.Transnat'l L. 515, 550 (1988); Lake & Dana, "Judicial Review of Awards of the Iran-United States Claims Tribunal: Are the Tribunal Awards Dutch?," 16 Law & Policy Int'l Bus. 755, 796–800 (1984); *but see* A.J. Van den Berg, The New York Arbitration Convention of 1958: To-wards a Uniform Judicial Interpretation at 28–40 (1981).

13. In addition, we are reluctant to read into the statute a jurisdictional requirement based on language contained in a defensive clause of the Convention, for fear of ruling on the merits. To do so might well allow Gould to avoid its bur-den of proof. After all, it is Gould that carries the burden of proving that the award is not

**V**

The district court properly denied that portion of Gould's motion to dismiss for lack of jurisdiction over this matter under 9 U.S.C. § 203, because the award of the Iran–United States Claims Tribunal that Iran seeks to enforce "falls under" the New York Convention. Because we conclude that jurisdiction exists under section 203, we do not reach the question of whether there was jurisdiction under 28 U.S.C. § 1331. Therefore, we do not consider Iran's cross-appeal on the question of whether the Algiers Accords are self-executing.

AFFIRMED.

consistent with the law of the nation in which it is rendered. Article V, ¶ 1 ("Recognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, *only if that party furnishes* to the competent authority where the recognition and enforcement is sought, proof that ...") (emphasis supplied); *see also* A. van den Berg, *The New*

*York Arbitration Convention of 1958* at 40 ("[T]he only possibility to oppose the enforcement on the ground that the award is not governed by an arbitration law is to obtain a declaration of the court in the country in which the award was made that the award is not an award within the purview of its arbitration law").