969 F.2d 764
 MINISTRY OF DEFENSE OF THE ISLAMIC REPUBLIC OF IRAN,
Plaintiff-Appellant,
v.
GOULD, INC., Gould Marketing, Inc., Hoffman Export
Corporation, Gould International, Inc.,
Defendants-Appellees.
MINISTRY OF DEFENSE OF THE ISLAMIC REPUBLIC OF IRAN,
Plaintiff-Appellee,
v.
GOULD, INC., Defendant,
and
Gould Marketing, Inc., Hoffman Export Corporation, Gould
International, Inc., Defendants-Appellants.
 Nos. 91-55135, 91-55136.
 United States Court of Appeals,
Ninth Circuit.
 Argued Feb. 5, 1992.
Submission Deferred Feb. 7, 1992.
Submitted May 15, 1992.
Decided June 30, 1992.
 
 Richard E.M. Brakefield, Anthony J. Van Patten, Arndt & Van Patten, Los Angeles, Cal., for plaintiff-appellant.
 Marc S. Palay, Thomas L. Abrams, and T. Jay Barrymore, Jones, Day, Reavis & Pogue, Washington, D.C., for defendants-appellees.
 Elizabeth A. Cavendish, U.S. Dept. of Justice, Washington, D.C., for amicus curiae, U.S.
 Appeal from the United States District Court for the Central District of California.
 Before: BRUNETTI, O'SCANNLAIN, and T.G. NELSON, Circuit Judges.
 O'SCANNLAIN, Circuit Judge:
 
 
 1
 Iran seeks to enforce a foreign arbitral award against U.S. nationals in federal court. The district court dismissed one defendant, Gould, Inc., because it was not the alter ego of any party to the arbitration, and we affirm. The district court confirmed the award against the remaining defendants, but modified the specific performance part of the award. We affirm in part and vacate in part such confirmation and modification of the award and remand for further proceedings.
 
 
 2
 * In 1975, the government of Iran entered into an agreement with Hoffman Export Corporation ("Hoffman") for the sale of military communications equipment and related services to Iran. In January 1978, all shares of Hoffman stock were acquired by Gould, Inc. Later that year, in April 1978, Hoffman, now a wholly-owned subsidiary of Gould, Inc., entered into a second agreement with the government of Iran to provide more military communications equipment and services.
 
 
 3
 The United States embassy in Teheran, Iran, was seized and diplomatic personnel taken hostage on November 4, 1979. See Ministry of Defense of the Islamic Republic of Iran v. Gould Inc. (Gould III), 887 F.2d 1357, 1358 (9th Cir.1989) (prior proceeding in this case), cert. denied, 494 U.S. 1016, 110 S.Ct. 1319, 108 L.Ed.2d 494 (1990). Performance of the 1975 and 1978 agreements was disrupted. Id. at 1360.
 
 
 4
 Early in 1980, Hoffman filed suit against the Ministry of Defense of the Islamic Republic of Iran ("Iran") in federal district court, alleging breach of contract. Id. Meanwhile, the governments of the United States and Iran reached an agreement to end the hostage crisis. The countries agreed, inter alia, to establish the Iran-United States Claims Tribunal ("Claims Tribunal" or "Tribunal"), a forum in "which nationals of either country could present their claims against the government of the other." Id. at 1359. The Claims Tribunal would also have jurisdiction over "any counterclaims arising out of the same transaction." Id. On January 19, 1981, President Carter issued Executive Orders implementing the agreement with Iran, and President Reagan, who was inaugurated the following day, "issued an Executive Order ratifying the implementing Orders President Carter had issued." Id. at 1360.
 
 
 5
 President Reagan "suspended" all claims in United States courts that fell within the jurisdiction of the Claims Tribunal. Id. at 1360. The Supreme Court upheld the President's authority to order such suspension of claims. Dames & Moore v. Regan, 453 U.S. 654, 686, 101 S.Ct. 2972, 2990, 69 L.Ed.2d 918 (1981). Accordingly, the district court dismissed without prejudice Hoffman's breach of contract action against Iran. See Security Pacific Nat'l Bank v. Government & State of Iran, 513 F.Supp. 864, 884 (C.D.Cal.1981).
 
 
 6
 Hoffman then brought claims against Iran before the Claims Tribunal, alleging breach of the 1975 and 1978 contracts. Gould III, 887 F.2d at 1360. Iran in turn filed counterclaims against Hoffman also alleging breach of contract. Id. During the pendency of the arbitral proceedings, Hoffman was merged into Gould Marketing, Inc. ("GMI"). During this time, all shares in GMI were owned by Gould International, Inc. ("GII"), and all shares in GII were in turn owned by Gould, Inc. Thus GMI was Hoffman's successor in interest, and, as was Hoffman, a wholly-owned subsidiary of Gould, Inc. GMI was substituted for Hoffman as the claimant in the pending arbitration before the Claims Tribunal.
 
 
 7
 On July 27, 1983, the Claims Tribunal issued an interlocutory award. Gould Marketing, Inc. v. Ministry of Nat'l Defense of Iran (Gould I), 3 Iran-U.S.Cl.Trib.Rep. 147 (1983). The Tribunal rejected both parties' breach of contract claims, concluding instead that "[p]erformance had become essentially impossible." Id. at 154. "By December 1978, strikes, riots and other civil strife in the course of the Islamic Revolution had created classic force majeure[1] conditions at least in Iran's major cities." Id. at 152-53. The nonperformance of both parties was not a breach because "the continued existence of force majeure conditions had by mid-1979 ripened into a termination of the Hoffman-Ministry contract." Id. at 154. The Tribunal ordered "further briefing and oral argument on the general question of what consequences should result from the discharge of the contract through frustration or impossibility." Id.
 
 
 8
 On October 27, 1983, following both parties' submission of briefs, a hearing was held. Gould Marketing, Inc. v. Ministry of Defence of the Islamic Republic of Iran (Gould II), 6 Iran-U.S.Cl.Trib.Rep. 272, 273 (1984). "Neither Party believe[d] that it should be left in the position in which it was found following the frustration of the contract." Id. Instead, both parties urged compensation for goods and services provided without payment and reimbursement of payments where goods and services were never received. Id. at 274. Iran also persisted in its claim for damages under a breach of contract theory. Id.
 
 
 9
 The Claims Tribunal entered a final award on June 29, 1984. The Tribunal's inquiry was straightforward: for both the 1975 and 1978 contracts, it sought to "ascertain the extent to which Hoffman performed its contractual obligations until such performance was made impossible, and whether, based on such performance, it is entitled to receive further payments or, on the contrary, must return to the Ministry part of the payments it received." Id. at 275. After proceeding item by item through both the 1975 and 1978 contracts, and determining what GMI's predecessor Hoffman had performed, and what Iran had paid, the Tribunal concluded that GMI owed Iran $3,640,247.13. Id. at 288. In addition, the Tribunal stated that GMI was "obligated to make available" to Iran certain communications equipment in the possession of GMI. Id.
 
 
 10
 Iran sought confirmation and enforcement of the Claims Tribunal award by filing suit in district court. Although only GMI was named in the Claims Tribunal award, see id., Iran also sought enforcement against Gould, Inc., Hoffman, and GII. GMI, Gould, Inc., Hoffman, and GII (collectively "respondents") filed a motion to dismiss for lack of subject-matter jurisdiction. Gould III, 887 F.2d at 1361. The district court held that it had jurisdiction to hear Iran's enforcement action under 9 U.S.C. § 203, which grants jurisdiction to federal courts over claims arising from certain foreign arbitral awards. Id. at 1362. The district court certified the question of jurisdiction for interlocutory appeal, and we agreed to hear such appeal pursuant to 28 U.S.C. § 1292(b). Id.
 
 
 11
 This court affirmed, holding that the Claims Tribunal award fell under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention" or "Convention") because the award "(1) ... ar[o]se out of a legal relationship (2) which [was] commercial in nature and (3) which [was] not entirely domestic in scope." Id. The court rejected respondents' argument that the award did not "derive from an arbitral agreement in writing to which the parties voluntarily submitted," as required under the New York Convention, construing the agreement between Iran and the United States establishing the Claims Tribunal "as representing the written agreement so required." Id. at 1363. The court was also unable to find in the Convention a requirement, urged by respondents, that awards must be based on the national arbitration law of a state that is a party to the Convention in order to be enforceable. Id. at 1365. Because the award here fell under the Convention, and "Congress vested federal district courts with original jurisdiction over any action or proceeding 'falling under the Convention,' " id. at 1362 (quoting 9 U.S.C. § 203), the court concluded that the district court had jurisdiction to hear Iran's enforcement suit. Id. at 1366.
 
 
 12
 The case returned to the district court for cross motions for summary judgment. The district court held "as a matter of law that the plaintiffs have failed to show that Gould, Inc. was the alter ego of Hoffman Export Corporation, Gould Marketing, Inc., or Gould International, Inc." and dismissed Gould, Inc. with prejudice from the case. The district court confirmed the $3.6 million award against the remaining respondents, but modified the award in one respect. Respondents were relieved of the obligation to make available to Iran the communications equipment because the district court determined that "doing so would violate United States export restrictions." The court added, however, that "if these restrictions are lifted within a reasonable time after this Order is entered, then the defendants must return or make available the equipment as directed by the Award."
 
 
 13
 Iran appeals the dismissal of Gould, Inc. as a party. Respondents appeal the confirmation of the monetary portion of the award. Both parties appeal the district court's modification of the specific performance portion of the award. We have jurisdiction over this timely appeal of a final judgment of the district court under 28 U.S.C. § 1291.
 
 II
 
 14
 Iran urges that Gould, Inc. should be reinstated as a party to this action. Gould, Inc. was not a party to the 1975 or 1978 contracts nor to the arbitration that ensued from such contracts. Indeed, Gould, Inc. had no connection to Hoffman when Hoffman entered into the 1975 contract.[2] Moreover, the Claims Tribunal entered its award of $3.6 million and communications equipment against GMI alone, despite knowing that Gould, Inc. was the sole shareholder of GMI. See Gould II, 6 Iran-U.S.Cl.Trib.Rep. at 285. Iran contends, however, that Gould, Inc. is the alter ego of GMI, and hence is liable for the judgment debts of GMI. In the alternative, Iran argues that there is at least a genuine issue as to whether Gould, Inc. is the alter ego of GMI, and that accordingly summary judgment dismissing Gould, Inc. with prejudice was inappropriate.
 
 
 15
 As the case law of this circuit has evolved,[3] "a sort of generalized federal substantive law on disregard of [the] corporate entity" has developed. Seymour v. Hull & Moreland Eng'g, 605 F.2d 1105, 1111 (9th Cir.1979). "To determine whether stockholders are personally liable for the debts of their corporations, this court relies on three factors: the amount of respect given to the separate identity of the corporation by its shareholders, the fraudulent intent of the incorporators, and the degree of injustice visited on the litigants by recognition of the corporate entity." Laborers Clean-up Contract Admin. Trust Fund v. Uriarte Clean-up Serv., Inc., 736 F.2d 516, 524 (9th Cir.1984) (citing Seymour, 605 F.2d at 1111).
 
 
 16
 In applying the first prong of the test, we look to whether "sufficient respect was paid the corporate formalities." See Seymour, 605 F.2d at 1112. Gould, Inc. supported its summary judgment motion for dismissal with an affidavit of its Assistant Secretary. The affidavit states that Hoffman, GMI, and GII were managed by their own corporate officers distinct from those of Gould, Inc., had separate boards of directors from Gould, Inc., kept separate minutes of meetings of their boards, and held separate shareholders' meetings. Hoffman, GMI, and GII kept their own bank accounts, financial accounts, and income tax statements. They accounted for their profits and losses separately from Gould, Inc., and no assets or funds were commingled.
 
 
 17
 The evidence advanced by Iran to show that the corporate veil must be pierced is slim. On two documents submitted together to the Claims Tribunal early in the arbitration, Hoffman's attorneys incorrectly referred to Hoffman as a "division" instead of a subsidiary of Gould, Inc. A modification to one of the contracts between Hoffman and Iran was signed by one "Roy S. Johnston, For: Gould, Inc." The document expressly states, however, that it represents an agreement between Iran and Hoffman, "a subsidiary of Gould, Inc." Iran submits a copy of a denied application for an export license for communication equipment, completed by Gould, Inc. Iran also notes that in this action all respondents are represented by the same attorneys.
 
 
 18
 In the face of Gould, Inc.'s uncontradicted representation that all corporate formalities have been observed, these isolated incidents cited by Iran do not establish a genuine issue as to whether Gould, Inc. was sufficiently respectful of Hoffman, GMI, and GII's separate identities.
 
 
 19
 The second prong of the corporate entity test requires us to look for "any fraudulent intent in forming the corporation." Seymour, 605 F.2d at 1112-13. Courts "find evidence of fraudulent intent in the failure of the incorporators adequately to capitalize the corporation at its inception." Laborers, 736 F.2d at 524. Iran points to no evidence of undercapitalization, such as insufficient capital "to operate [the] business and pay its debts as they mature." Id. Hoffman was an independent firm when purchased by Gould, Inc. in 1978. There is simply no indication of any fraudulent intent on the part of Gould, Inc. in purchasing Hoffman, or in maintaining Hoffman and its successors as wholly-owned subsidiaries.
 
 
 20
 The third prong directs our attention to "the degree of injustice visited on the litigants by recognition of the corporate entity." Seymour, 605 F.2d at 1111. Iran has produced no evidence that Hoffman, GMI, and GII would be unable to satisfy the award against them. Even if Iran had made such a showing, however, "inability to collect does not, by itself, constitute an inequitable result." Seymour, 605 F.2d at 1113. Iran has failed to demonstrate inequity in recognizing the separate corporate identities of Gould, Inc. and GII and its predecessors.
 
 
 21
 Under this analysis there is no reason here to pierce the corporate veil and expose the shareholder, Gould, Inc., to liability. Viewing Iran's evidence in the most favorable light, a few instances where Hoffman's relationship to Gould, Inc. was mislabeled do not create a genuine issue as to Gould, Inc.'s separateness from Hoffman and its successors. We affirm the district court's dismissal of Gould, Inc. from this action with prejudice.
 
 III
 
 22
 Respondents contend that the Claims Tribunal exceeded its jurisdiction in rendering an award in favor of Iran. The burden of proving that the Claims Tribunal exceeded its jurisdiction rests on respondents, as the party opposing confirmation of the award. La Societe Nationale Pour La Recherche v. Shaheen Natural Resources Co., 585 F.Supp. 57, 61 (S.D.N.Y.1983), aff'd, 733 F.2d 260 (2d Cir.), cert. denied, 469 U.S. 883, 105 S.Ct. 251, 83 L.Ed.2d 188 (1984). Respondents' burden is substantial because "[t]he public policy in favor of international arbitration is strong." Fotochrome, Inc. v. Copal Co., 517 F.2d 512, 516 (2d Cir.1975).
 
 
 23
 The district court's--and hence this court's--review of a foreign arbitration award is quite circumscribed. The award of the Claims Tribunal here has been held to fall under the New York Convention. Gould III, 887 F.2d at 1366. Congress has given federal courts jurisdiction to hear actions falling under the New York Convention. 9 U.S.C. § 203. More particularly, a party to a foreign arbitration may apply to federal district court "for an order confirming the award as against any other party to the arbitration." 9 U.S.C. § 207. The district court has little discretion: "[t]he court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the [New York] Convention." Id. (emphasis added).
 
 
 24
 Article V of the New York Convention lists the reasons why "[r]ecognition and enforcement of the award may be refused." Convention on the Recognition and Enforcement of Foreign Arbitral Awards, art. V, § 1, reprinted in 9 U.S.C.A. § 201 note (West.Supp.1991) [hereinafter New York Convention]. Although no section of Article V uses the language of "jurisdiction" as a ground for refusing to enforce a foreign arbitral award, respondents apparently seek to invoke section 1(c). Under that provision, a court may refuse to recognize and to enforce an award if "[t]he award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration." New York Convention, art. V, § 1(c). Because a "general pro-enforcement bias inform[ed] the Convention," Parsons & Whittemore Overseas Co. v. Societe Generale de L'Industrie du Papier (Rakta), 508 F.2d 969, 973 (2d Cir.1974), section 1(c) "should be construed narrowly," id. at 976.
 
 
 25
 Thus, our inquiry, as framed by the New York Convention, is whether the Claims Tribunal award "deals with a difference not contemplated by or not falling within the terms of the submission to arbitration." We have previously held that the agreement between Iran and the United States creating the Claims Tribunal was the "submission to arbitration" in this case. Gould III, 887 F.2d at 1363. The agreement between Iran and the United States, often referred to as the "Algiers Accords," consisted of two parts. Id. at 1359. The second part, the Declaration of the Government of the Democratic and Popular Republic of Algeria Concerning the Settlement of Claims by the Government of the United States of America and the Government of the Islamic Republic of Iran (the "Claims Settlement Declaration"), established the Claims Tribunal. Id. Article II of the Claims Settlement Declaration states,
 
 
 26
 An international arbitral tribunal (the Iran-United States Claims Tribunal) is hereby established for the purpose of deciding claims of nationals of the United States against Iran, ... and any counterclaim which arises out of the same contract, transaction or occurrence that constitutes the subject matter of that national's claim....
 
 
 27
 Claims Settlement Declaration, 1 Iran-U.S.Cl.Trib.Rep. 9 (1981).
 
 
 28
 We have little difficulty concluding that the award here "deals with a difference ... falling within the terms of the submission to arbitration," that is, within the Claims Settlement Declaration. The "subject matter of the national's claim" here is obvious: the 1975 and 1978 contracts between Hoffman and Iran. It is equally evident that Iran's counterclaims "arise[ ] out of" these contracts. Because the award resolves the claims and counterclaims connected with the two contracts, it clearly falls within Article II of the Claims Settlement Declaration, and hence does not exceed the scope of the submission to arbitration.
 
 
 29
 Respondents argue, however, that the Claims Tribunal award is not actually based on Iran's counterclaims, because the award is not based on the same legal theory as that stated in the pleadings for Iran's counterclaims. As did Hoffman, Iran initially pled a breach of contract theory in support of its claims. After rejecting the breach of contract theory argued by both parties, the Claims Tribunal allowed supplemental "briefing and oral argument on the general question of what consequences should result from the discharge of the contract through frustration or impossibility." Gould I, 3 Iran-U.S.Cl.Trib.Rep. at 154. Although Iran apparently did not amend its pleadings, it submitted a brief to the Claims Tribunal in which it stated, "[Iran] believes that an accounting should be conducted to determine over-payments made by the Defense Ministry to Hoffman." Brief of Iran, submitted to the Claims Tribunal Oct. 27, 1983, at 52.[4] The Claims Tribunal award is based on such an accounting. Gould II, 6 Iran-U.S.Cl.Trib.Rep. at 275.
 
 
 30
 It is not accurate, then, to say that the award is based on a legal theory consistently opposed by Iran. Indeed, Iran submitted a brief asking, inter alia, for an equitable accounting. The Claims Tribunal award is not inconsistent with the substance of Iran's position, but rather with the legal theory espoused in Iran's original pleadings, which Iran neglected to amend.
 
 
 31
 We have no occasion to decide whether the pleading rules of the Claims Tribunal require a party formally to amend its pleadings to reflect the addition of an alternative legal theory, because in any event deficiencies in the formalities of pleadings are simply not within the scope of our review. Under the New York Convention, we examine whether the award exceeds the scope of the Claims Settlement Declaration, not whether the award exceeds the scope of the parties' pleadings. A technical pleading error, such as that alleged here, cannot be the basis for our refusing to confirm a foreign arbitral award.
 
 
 32
 Respondents also make much of the Claims Tribunal's statement at the end of its final award that it was "dismiss[ing]" Iran's counterclaims. Under the Claims Settlement Declaration, an award against a U.S. national and in favor of Iran must be based on a counterclaim to an action brought by the U.S. national. See Claim Settlement Declaration, Art. II(1), 1 Iran-U.S.Cl.Trib.Rep. at 9. Thus, to the extent the Claims Tribunal actually meant that it was dismissing Iran's counterclaims, it would also be eliminating its authority to make an award to Iran.
 
 In context, the Claims Tribunal stated:
 
 33
 Gould Marketing, Inc., is obligated to pay to the Respondent, Ministry of Defence of the Islamic Republic of Iran, U.S. $3,640,247.13.
 
 
 34
 The counterclaims are dismissed on the merits.
 
 
 35
 Gould II, 6 Iran-U.S.Cl.Trib.Rep. at 288. These two sentences appear to be flatly contradictory. On the one hand, the Claims Tribunal awarded Iran $3.6 million. Yet on the other hand, it dismissed the very counterclaims upon which such an award necessarily is based. Given their usual meaning, these two sentences are mutually inconsistent. We proceed under the assumption, however, that the Claims Tribunal is not irrational. One of these sentences, then, cannot mean what it initially appears to mean. Cf. In re Trans Alaska Pipeline Rate Cases, 436 U.S. 631, 643, 98 S.Ct. 2053, 2061, 56 L.Ed.2d 591 (1978) (When interpreting a statute, the court "has some scope for adopting a restricted rather than a literal or usual meaning of its words where acceptance of that meaning would lead to absurd results"); Love v. Thomas, 858 F.2d 1347, 1354 (9th Cir.1988) ("If possible, we must give ... apparently conflicting provisions a sensible reading that avoids redundancy or surplusage."), cert. denied, 490 U.S. 1035, 109 S.Ct. 1932, 104 L.Ed.2d 403 (1989).
 
 
 36
 Reading the award as a whole, it appears that the Claims Tribunal meant merely to reject the breach of contract theory contained in Iran's counterclaims, and not to eliminate its own jurisdiction. Aside from this one sentence "dismiss[ing]" the counterclaims, the entire remainder of the award is devoted to explaining the legal theory underlying the award and how the $3.6 million figure was calculated. It seems highly implausible that, after fifteen pages of detailed explanation of the legal and factual basis for the award, the Claims Tribunal intended to negate at the end of its opinion everything that came before it. The ordinary meaning of the sentence dismissing Iran's counterclaims goes against the weight and force of every other sentence in the award.
 
 
 37
 We conclude that a sensible reading of the sentence dismissing Iran's counterclaims, one that avoids rendering the entire rest of the award absurd or superfluous, is that the Tribunal meant no more than to dismiss the legal argument contained in such claims. The Tribunal could not have meant that it was dismissing the very counterclaims upon which its award was based.
 
 IV
 
 38
 In addition to making a monetary award in Iran's favor, the Claims Tribunal also ordered GMI to "make available" to Iran certain communications equipment. Gould II, 6 Iran-U.S.Cl.Trib.Rep. at 288. The equipment in question was in the possession of Hoffman for repairs and other reasons when the Islamic Revolution began, and has been held by the Tribunal to be the property of Iran. Id. at 287.
 
 
 39
 Both parties agree that export of such equipment from the United States to Iran is prohibited by U.S. law because the Secretary of State has determined that Iran supports acts of international terrorism. See 22 U.S.C. § 2780(b), (d); 49 Fed.Reg. 2,836 (1984).[5] Accordingly, the district court ordered:
 
 
 40
 The Award is modified in that the defendants are not required to return this equipment or make it available because doing so would violate United States export restrictions.... However, if these restrictions are lifted within a reasonable time after this Order is entered, then the defendants must return or make available the equipment as directed by the Award.
 
 
 41
 Both parties contest this part of the court's order. Iran urges that the district court should have affirmed the award as is; respondents contend that the court should have rejected the award in whole because this portion is contrary to public policy.
 
 
 42
 The State Department argues, apparently for the first time in this litigation, in a brief amicus curiae filed by the Department of Justice on the eve of oral argument, that the Claims Tribunal award could be satisfied without violating federal export restrictions by making the equipment available to Iran in the United States. The State Department alleges that Iran has a warehousing agreement with a warehouse in Virginia, and that such warehouse could accept the equipment for Iran. The equipment could then be sold from the warehouse to a third party, with the proceeds going to Iran. The State Department also alleges that, after entry of the order being appealed here, a letter was sent to Iran and to respondents suggesting this approach, and pledging the State Department's assistance in finding a buyer for the equipment who could lawfully use or export it.
 
 
 43
 Even assuming that the State Department is entirely correct in its assertion that the proposed transfer of the equipment to the Virginia warehouse is consistent with the Arms Export Control Act, 22 U.S.C. §§ 2751-96, at least two issues are presented by this proposal. First, even if depositing the equipment in the Virginia warehouse would not run afoul of the export restriction laws, there is a separate regulatory scheme administered by the Treasury Department which bars the transfer within the U.S. of Iranian assets to Iran, absent a license from the Treasury Department. See 31 C.F.R. § 535.215(c). Two months after this case was argued, the government submitted a letter to this court under the authority of Federal Rule of Appellate Procedure 28(j), asserting that such a license has been granted by the Treasury Department to respondents. "Rule 28(j) permits a party to bring new authorities to the attention of the court; it is not designed to bring new evidence through the back door." Trans-Sterling, Inc. v. Bible, 804 F.2d 525, 528 (9th Cir.1986). We decline to go outside the record to consider new facts submitted by a non-party at this stage of these proceedings.
 
 
 44
 Second, it is unclear whether a plan that essentially amounts to selling the equipment and giving over the proceeds to Iran would actually fulfill the terms of the award, which lists particular pieces of equipment that must be "made available" to Iran. To the degree that the State Department plan does not meet the letter of the award, but is more akin to a compromise settlement, Iran's acquiescence in the plan would be needed. Iran has so far declined to express its views on the proposed arrangement.
 
 
 45
 The district court was denied an opportunity to consider the warehousing arrangement now urged by the State Department. Consequently, no record has been developed regarding the factual or legal status of the Virginia warehouse or regarding any actions taken by the parties since entry of the district court's order in connection with such warehouse or obtaining a Treasury license. Also, because it was assumed that the export restrictions barred making the equipment available to Iran, the scope of the Treasury regulations on the transfer of Iranian assets has not been explored. Because resolution of the issues raised by the State Department approach depends in part on factual determinations regarding, inter alia, the existence and status of the Virginia warehouse and the actions of the parties in applying for or receiving a Treasury Department license, we think it best to allow the district court the chance to address these issues in the first instance.
 
 
 46
 Accordingly, we vacate and remand for further proceedings that portion of the district court's order that concerned specific performance of the Claims Tribunal award. We express no views at this time on the legality under the New York Convention of the district court's actions concerning specific performance of the award, or on whether the State Department's proposal is consistent with federal law or fulfills the terms of the award.
 
 V
 
 47
 We vacate the district court's order to the extent it concerns that part of the Claims Tribunal award which ordered GMI to make available to Iran certain equipment, and remand for further proceedings. We affirm the district court's order in all other respects.
 
 
 48
 Each side shall bear its own costs.
 
 
 49
 AFFIRMED IN PART, VACATED IN PART AND REMANDED.
 
 
 
 [1]
 The Claims Tribunal defined force majeure as "social and economic forces beyond the power of the state to control through the exercise of due diligence." Id. at 153
 
 
 [2]
 To recapitulate the changes in corporate structure from 1975 until 1988: Hoffman was an independent corporation in 1975; in 1978, Gould, Inc. purchased Hoffman, and thereafter operated Hoffman as a wholly-owned subsidiary; in 1981, Hoffman was merged into another wholly-owned subsidiary of Gould, Inc., named Gould Marketing, Inc. ("GMI"); as successor to Hoffman, GMI was substituted for Hoffman in the Claims Tribunal proceedings; in 1988, GMI was merged into yet another wholly-owned subsidiary of Gould, Inc., named Gould International, Inc. ("GII")
 
 
 [3]
 We note that whether we should follow our own cases or incorporate California law into federal law here is not entirely free from doubt. See Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 425, 84 S.Ct. 923, 938, 11 L.Ed.2d 804 (1964) ("rules of international law should not be left to divergent and perhaps parochial state interpretations"); but see Kamen v. Kemper Fin. Serv., --- U.S. ----, 111 S.Ct. 1711, 1717, 114 L.Ed.2d 152 (1991) ("The presumption that state law should be incorporated into federal common law is particularly strong in areas in which private parties have entered legal relationships with the expectation that their rights and obligations would be governed by state-law standards.... Corporation law is one such area.")
 In any event, California law on piercing the corporate veil is substantially similar to the rule announced in our cases. See Mesler v. Bragg Mgt. Co., 39 Cal.3d 290, 216 Cal.Rptr. 443, 448, 702 P.2d 601, 606 (1985) (requirements to pierce the corporate veil: "(1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow"). Under the facts of this case, application of California and federal law dictate the same result.
 
 
 [4]
 Iran also continued to seek "damages for Hoffman's alleged breach of the contract." Id. at 3
 
 
 [5]
 The Claims Tribunal was aware that U.S. law barred respondents from exporting to Iran such equipment. "Under these circumstances, which are beyond the control of [GMI], the failure of [GMI] to export the equipment to Iran cannot be considered wrongful on [its] part. Nor can [GMI] be debited with the value of that equipment. But, as a bailee, [GMI] is under an obligation to make [the communications equipment] available to [Iran]." Gould II, 6 Iran-U.S.Cl.Trib.Rep. at 279