**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

POLIMASTER LTD.; NA&SE TRADING
CO., LIMITED,
    *Plaintiffs-Appellants,*

     v.

RAE SYSTEMS, INC.,
    *Defendant-Appellee.*

No. 08-15708

D.C. No.
05-CV-01887-JF

POLIMASTER LTD.; NA&SE TRADING
COMPANY LTD.,
    *Plaintiffs-Appellants,*

     v.

RAE SYSTEMS, INC.,
    *Defendant-Appellee.*

No. 09-15369

D.C. No.
5:05-cv-01887-JF

OPINION

Appeal from the United States District Court
for the Northern District of California
Jeremy D. Fogel, District Judge, Presiding

Argued and Submitted
January 15, 2010—San Francisco, California

Filed September 28, 2010

Before: J. Clifford Wallace, Procter Hug, Jr. and
Richard R. Clifton, Circuit Judges.

Opinion by Judge Wallace;
Dissent by Judge Clifton

16549

---

**COUNSEL**

Kevin R. Garden, Esq., Alexandria, Virginia, for appellants Polimaster Ltd., et al.

John P. Flynn, Esq., San Francisco, California, for appellee RAE Systems, Inc.

---

**OPINION**

WALLACE, Senior Circuit Judge:

Appellants Polimaster Ltd. and Na&Se Trading Company, Ltd. (Na&Se) (collectively, Polimaster) appeal from the district court's confirmation of an arbitration award against them and in favor of appellee RAE Systems, Inc. (RAE). They also appeal from the district court's subsequent order granting pre- and post-judgment interest on the arbitration award. We have jurisdiction pursuant to 28 U.S.C. § 1291 and 9 U.S.C. § 16(a)(1)(D), and we reverse and remand.

**I.**

Appellant Polimaster Ltd. is a limited liability company based in Belarus, engaged in the design and manufacture of

radiation monitoring instruments. Appellant Na&Se is a corporation based in Cyprus, engaged in intellectual property licensing. In January 2003, Polimaster Ltd. and Na&Se entered into a contractual relationship with RAE, a Delaware corporation with its principal place of business in California. The parties signed two agreements, the "Nonexclusive License for Proprietary Information Usage" (License Agreement) and the "Product and Component Buy/Sell Agreement" (Buy/Sell Agreement), which provided for RAE's manufacture and distribution of Polimaster-developed radiation detection devices.

The License Agreement refers to Na&Se as the "Licensor," RAE as the "Licensee," Na&Se and RAE as the "Parties," and Polimaster Ltd. as the "Manufacturer." The License Agreement contains a dispute resolution provision that states:

> 9.1 In case of the dispute between the Licensor and the Licensee on the issues provided for by the present Agreement the Parties shall take every effort for their settlement by negotiations.
>
> 9.2 In case of failure to settle the mentioned disputes by means of negotiations they should be settled by means of arbitration at the defendant's side.

The parties agree that "defendant's side" means "defendant's *site*," that is, the geographical location of the defendant's principal place of business. The Buy/Sell Agreement also contains an arbitration clause, which states, "7.1 The Parties shall exert the best efforts to settle up any disputes by means of negotiations, and in case of failure to reach an agreement the disputes shall be settled by arbitration at the defendant's site."

Disputes arose in the course of performing the agreements. In May 2005, Polimaster filed an action against RAE in the United States District Court for the Northern District of Cali-

fornia. After the district court denied Polimaster's request for a preliminary injunction, the parties negotiated to submit Polimaster's claims to arbitration in California (that is, defendant RAE's "site," as directed in the agreements). In May 2006, Polimaster and RAE commenced arbitration by a joint letter to "JAMS," an arbitration provider organization (since renamed "JAMS, The Resolution Experts"). Although the parties jointly submitted to arbitration, Polimaster made the following reservation:

> It is Polimaster's position that no counterclaims will be filed in this matter based on the requirement in the agreement that all such claims be filed in the location of the party against whom such claims are brought. Because Polimaster is located in Belarus, Polimaster asserts that all such claims against it shall be brought in that location.

In July 2006, Polimaster submitted its demand for arbitration, setting forth claims against RAE for breach of contract under both the License Agreement and the Buy/Sell Agreement, misappropriation of trade secrets, and unfair competition. In August 2006, RAE submitted its answer to Polimaster's demand for arbitration, in which RAE set forth not only its affirmative defenses and responses to Polimaster's allegations, but also RAE's own claims against Polimaster, which it called "counterclaims." RAE asserted several claims sounding in contract and tort, including interference with prospective economic advantage, fraud and negligent misrepresentation.

Polimaster asked the arbitrator to dismiss RAE's "counterclaims," arguing that any claims by RAE against Polimaster could not be arbitrated at RAE's site in California, because the arbitration agreement required that they be brought at the "defendant's [site]," that is, at Polimaster's site. The arbitrator refused to dismiss RAE's counterclaims, reasoning that the contract did not specify where counterclaims should be

brought. To fill the perceived gap, he applied procedural rules regarding compulsory counterclaims, as defined in Federal Rules of Civil Procedure, California Rules of Civil Procedure, and JAMS rules. The arbitrator decided it would be contrary to "notions of fairness, judicial economy and efficiency" to "[p]rosecut[e] a claim with affirmative defenses in one venue while simultaneously prosecuting counterclaims almost identical to the affirmative defenses in another [venue]." Instead, he reasoned, RAE's "counterclaims" should be "heard in the same venue as the properly situated original arbitration claims [by Polimaster against RAE]."

The arbitrator in California ultimately adjudicated both Polimaster's claims and RAE's "counterclaims." The arbitrator issued an Interim Award in July 2007, which rejected all of Polimaster's claims and awarded damages to RAE on its successful counterclaim, in the amount of $2,412,432. By a Final Arbitral Award dated September 20, 2007, the arbitrator confirmed the findings and conclusions of the Interim Award and further awarded costs to RAE, as the prevailing party, in the amount of $46,213.15.

Thereafter, RAE sought confirmation of the arbitration award in the United States District Court for the Northern District of California. Polimaster moved to vacate the award, arguing that the arbitral procedure was not in accordance with the parties' agreement and that the arbitrator exceeded his powers by allowing RAE to assert "counterclaims" at RAE's own site in California rather than at the "defendant's [site]" as required by the agreement. The district court confirmed the award to RAE, and this appeal followed.

## II.

[1] The parties agree that the arbitration agreement and award are governed by the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the New York Convention), June 10, 1958, 21 U.S.T. 2517. We must con-

firm an arbitration award falling under the New York Convention unless we determine that "one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the [sic] said Convention." 9 U.S.C. § 207; *see also Mgmt. & Technical Consultants S.A. v. Parsons-Jurden Int'l Corp.*, 820 F.2d 1531 (9th Cir. 1987) (*Parsons-Jurden*).

**[2]** The New York Convention enumerates seven defenses to the recognition or enforcement of an arbitral award. These grounds include, among others, that the award "deals with a difference not contemplated by or not falling within the terms of the submission to arbitration," that the parties were under some incapacity or their agreement is not valid under the law of the country where the award is made, or that the party against whom the award is invoked was not able to present its case. 21 U.S.T. 2517, Art. V, §§ 1(a)-(c). In this appeal, Polimaster invokes the defense set forth in Article V, § 1(d), of the New York Convention:

> (d) The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place.

21 U.S.T. 2517, Art. V, § 1(d). Polimaster asserts that the arbitration procedure was contrary to the parties' agreement because the arbitrator allowed RAE to bring its claims, calling them "counterclaims," against Polimaster in an arbitration proceeding in California, thereby permitting RAE to bring a claim at its own site.

We review de novo whether a party established a defense to enforcement of an arbitration award under the New York Convention. *China Nat'l Metal Prods. Import/Export Co. v. Apex Digital, Inc.*, 379 F.3d 796, 799 (9th Cir. 2004). As the party seeking to avoid enforcement of the award, Polimaster has the burden of showing the existence of a New York Con-

vention defense. *Ministry of Def. of the Islamic Republic of Iran v. Gould, Inc.*, 969 F.2d 764, 770 (9th Cir. 1992). Polimaster's burden is substantial because the public policy in favor of international arbitration is strong, *id*., and the New York Convention defenses are interpreted narrowly. *See China Minmetals Materials Imp. & Exp. Co., Ltd. v. Chi Mei Corp.*, 334 F.3d 274, 282-83 (3d Cir. 2003); *Gould*, 969 F.2d at 770 (adopting narrow interpretation of defense based on arbitrator exceeding authority); *Parsons & Whittemore Overseas Co. v. Societe Generale de L'Industrie Du Papier (RAKTA)*, 508 F.2d 969, 976 (2d Cir. 1974) (adopting narrow interpretation of public policy defense).

[3] The grounds for refusing confirmation of an award under the Federal Arbitration Act (FAA), 9 U.S.C. § 10, generally track those under the New York Convention, although they are not coextensive. *See Parsons-Jurden*, 820 F.2d at 1534. When interpreting the defenses to confirmation of an arbitration award under the New York Convention, we may look to authority under the FAA. *Parsons & Whittemore*, 508 F.2d at 974.

## III.

We may decline enforcement of an arbitral award on the basis that "the arbitral procedure was not in accordance with the agreement of the parties." 21 U.S.T. 2517, Art. V, § (1)(d). To determine whether the procedure used was contrary to the parties' agreed arbitral procedures, we must begin with the language of the parties' arbitration agreement. *See Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc.*, 403 F.3d 85, 91 (2d Cir. 2005); *Coast Trading Co. v. Pac. Molasses Co.*, 681 F.2d 1195, 1198 (9th Cir. 1982); *cf. generally Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002) (holding that, in the context of an arbitrability determination, the court reviews the contract de novo); *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 719 (9th Cir. 1999) (also in context of arbitrability determination, the interpreta-

tion of the relevant contractual provision was subject to de novo review).

## A.

In this case, the arbitration agreement provided that disputes "should be settled by means of arbitration at the defendant's [site]." According to Polimaster, the arbitration agreement required RAE's claims to be arbitrated in Belarus. According to RAE, the arbitration agreement was ambiguous concerning the treatment of counterclaims. Thus, according to RAE, the arbitrator correctly, and within the scope of his authority, resolved the ambiguity so as to allow litigation of RAE's counterclaims at its own site in California.

For the reasons stated hereafter, we conclude that the arbitration agreement required that all requests for affirmative relief, whether styled as claims or counterclaims, be arbitrated at the defendant's site. The arbitration agreement required that any "dispute" be arbitrated at "the defendant's [site]." The term "dispute" encompasses both claims and counterclaims. Moreover, a party is a "defendant" as to any dispute where another party seeks damages or some other form of relief against him. Therefore, Polimaster was clearly the "defendant" as to RAE's "counterclaims." The "dispute" embodied in those claims should not have been arbitrated at RAE's site in California.

## 1.

[4] The arbitration agreement was not ambiguous. The agreement contemplated that all claims should be asserted at the defendant's site. This provided a clear designation of the forum for arbitration. *Cf, e.g.*, *Bauhinia Corp. v. China Nat'l Mach. & Equip. Imp. & Exp. Corp.*, 819 F.2d 247, 249 (9th Cir. 1987) (ambiguous forum selection provision). The requirement of arbitration at the defendant's site is effectively a forum selection clause, in which the parties agreed to arbi-

trate at the location of a defendant's principal place of business. This choice of forum is presumptively enforceable. *See Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519 (1974); *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 13-14 (1972).

The dissent takes a different position: it asserts that the arbitration agreement is ambiguous. According to our dissenting colleague, "To the extent that any answer can be gleaned from the language used in the agreement, I think the language cuts slightly against the majority opinion's interpretation." The dissent points out that the arbitration clause in question provides that, in the event that "the mentioned disputes" cannot be settled by "negotiations[,] they should be settled by means of arbitration at the defendant's [site]." Because the word "disputes" is plural, but the words "defendant" and "side [site]" are singular, the dissent reasons that "[t]he parties anticipated that there could be multiple disagreements, yet the 'defendant's site' refers to only one location."

**[5]** The dissent's construction of the arbitration clause, however, is simply not reasonable. The term "disputes" as used in section 9.2 of the Agreement refers back to the category of disputes made subject to the arbitration clause, as defined in section 9.1 of the Agreement. Section 9.1 provides that, in the case of "the dispute [sic] between the Licensee and the Licensor on the issue provided for by the present Agreement" the parties were to make "every effort for their settlement by means of negotiations." Section 9.2 contemplates that, in the event that "the mentioned disputes" cannot be settled by negotiations, they should be "settled by means of arbitration at the defendant's [site]." Thus, the plural term "disputes," as used in section 9.2 of the Agreement, is merely a reference back to the covered disputes set forth in section 9.1, i.e. disputes "on the issues provided for by the present Agreement." When viewed in context, the plural term "disputes," cannot reasonably be said to mean consolidation of multiple claims into a single arbitration because that would be

contrary to the more specific forum-selection clause contained in section 9.2 of the Agreement.

**2.**

**[6]** The arbitrator opined that the arbitration clause was indeterminate because it failed to provide expressly for the treatment of counterclaims. The dissent likewise concludes that the arbitration clause is faulty for failure to contemplate counterclaims. But that the agreement neither expressly included nor excluded counterclaims does not render it indeterminate. There is no reason why the arbitration agreement *had to* provide for the treatment of counterclaims. To conclude that the arbitration clause is ambiguous on this basis sets up a rigged game: criticizing the failure to provide for the treatment of counterclaims *presumes* that such a clause is a necessary, indispensable, or essential component of an agreement to arbitrate. But there is no reason that this must be so.

The dissent argues that, "it is not a novel or obscure practice to resolve all claims, including counterclaims, in a single proceeding that has already commenced." The dissent, like the arbitrator below, also points to rules pertaining to counterclaims in the Federal Rules of Civil Procedure, the California Rules of Civil Procedure, and the rules of the arbitration forum agreed upon by the parties (JAMS). The dissent argues that the arbitration clause in this case is ambiguous because "[t]he prosecution of counterclaims in the same proceeding is broadly recognized in international arbitration." The dissent then points to general procedural rules and guidelines from several international arbitration provider organizations that typically would apply to the extent those rules are consistent with a given agreement to arbitrate. *See, e.g.*, International Chamber of Commerce (ICC) Rules of Arbitration art. 5; London Court of International Arbitration Rules art. 2.1(b); United Nations Commission on International Trade Law (UNCITRAL) Arbitration Rules art. 19.

**[7]** Nevertheless, although the joinder of counterclaims into a pending proceeding is widely contemplated by various rules of procedure, the parties simply did not incorporate these rules into their contract. Instead, once the *assumption* that counterclaims will be joined into a pending proceeding is recognized as what it is — merely an assumption — it is clear that the parties' clause was adequate to express their intent. To put the point differently, the parties' clause was adequate to provide for separate arbitrations at the defendant's site. *See, e.g.* Gary B. Born, *International Commercial Arbitration in the United States* 6 (1994). There is no reason to require the parties to include contractual language specifically defeating or negating the joinder of claims. The dissent's viewpoint is, in effect, based on the dissent's assumption that counterclaims should be joined in a pending proceeding. We believe it would be circular to interpret the parties' agreement therefore by reference to rules that the parties did not incorporate into their contract and which are inconsistent with the parties' agreement to arbitrate. *See, e.g.*, Emmanuel Gaillard & John Savage, Eds., *Fouchard, Gaillard, Goldman on International Commercial Arbitration* 632-53 (1999) (pointing out that the procedural rules of the forum need not apply to conduct of international arbitration).

Indeed, to the extent that we look to, or incorporate, our domestic rules of procedure in construing the arbitration clause at hand, we believe those rules tend to support our interpretation. Counterclaims are "affirmative claims for relief" and are "offensive in nature." Daniel R. Coquilette, et al., eds., *Moore's Federal Practice* § 13.90[1] (3d Ed. 2010); *see also FDIC v. F.S.S.S.*, 829 F. Supp. 317, 322 n.11 (D. Alaska 1993) ("Counterclaims are separate claims independent of the plaintiff's underlying claim."); *In re Concept Clubs, Inc.*, 154 B.R. 581, 586 n.4 (D. Utah 1993). Under Federal Rule of Civil Procedure 13, a party is the "defendant" against a counterclaim. *See Moore's Federal Practice* § 13.90[2][a]; *see also Rainbow Mgmt. Group v. Atlantis Submarines Haw., L.P.*, 158 F.R.D. 656, 659 (D. Haw. 1994);

*Earle M. Jorgenson Co. v. T.I. U.S., Ltd.*, 133 F.R.D. 472, 475 (E.D. Pa. 1991) ("Any party asserting a claim, whether an original claim, counterclaim, cross-claim or third-party claim, becomes an opposing party to the party sued" (internal citations and quotation marks omitted)).

**[8]** The dissent points out that the term "defendant" could have a different meaning depending on the context. For instance, in litigation, "defendant" is sometimes used as a "shorthand" to "distinguish the original defending party from the party initially on the offensive." *See* Moore's Federal Practice at § 13.90[2]. The term, however, is used in the latter sense only when it is clear from the relevant context that the court, tribunal, arbitrator, or the parties have formally designated one particular side as the "defendant." *See id*. In this case, the context and structure of the arbitration clause clearly indicate that the parties understood the "defendant" as a party against whom the other asserts a "dispute" arising out of the License Agreement or the Buy/Sell Agreement. Absolutely nothing in these agreements suggests that the parties understood the term "defendant" as a formal designation limited to the party *initially* on the defensive. It is well established that a counterclaim results in shifting the parties so that the party counterclaiming becomes the plaintiff on the counterclaim and the original plaintiff becomes the defendant. *See Roberts Min. & Mill v. Schrader*, 95 F.2d 522, 524 (9th Cir. 1938) (explaining that a "counterclaim [is], in effect, a new suit, in which Schrader was plaintiff and Smith was defendant"). Accordingly, there can be no dispute that Polimaster became the "defendant" as to RAE's claims against it for affirmative relief, regardless of how RAE styled those claims. Under the clear language of the arbitration agreement, Polimaster was entitled to have the claims against it arbitrated in its home forum.

**[9]** We acknowledge that the arbitration agreement in this case is an unusual one. The arbitration clause does not provide for a choice of law or a choice of procedural rules. *See*

*generally* Born at 24 (describing the several choice of law issues present in international arbitrations); Alan Redfern & Martin Hunter, *Law and Practice of International Commercial Arbitration*, 163-168 (2002). The arbitration clause also does not provide for the number of arbitrators or a method for their appointment. *Cf., e.g.*, ICC Standard Arbitration Clause, *available at www.iccarbitration.org* (last visited July 13, 2010) (recommending clause that states: "[a]ll disputes arising out of or in connection with the present contract shall be finally settled under the Rules of Arbitration of the [ICC] by one or more arbitrators appointed in accordance with the said Rules"); American Arbitration Association, *Drafting Dispute Resolution Clauses: A Practical Guide* at 4-5 (Sept. 1, 2007, *available at www.adr.org,* last visited July 13, 2010) (setting forth checklist of subjects generally appropriate for stipulation in arbitration clause); *id.* at 8-9 (providing several model arbitration clauses). In this case, the clause provides only for a choice of forum: defendants' [Polimaster] site. That choice is entitled to enforcement.

## B.

Admittedly, we have interpreted the parties' arbitration clause so as to permit an inefficient result: parallel arbitrations in distant fora regarding similar and/or related topics and disputes. Indeed, the dissent accurately points out that requiring arbitration of a "counterclaim" in a separate proceeding at Polimaster's site in Belarus "would represent an inefficient way to resolve disputes." Over this point there is no dispute. But we do not agree with the implication that the dissent draws from the apparent inefficiency of the parties' agreed procedures. The dissent argues that the arbitration clause should be construed in a manner to avoid inefficiency, because "[p]arties contractually adopting arbitration as the method for resolving disputes commonly do so to achieve efficiency." The dissent further adds that "[i]t is logical to reason that the parties to this agreement did not intend an inefficient result." Similarly, the arbitrator opined that parallel

arbitrations in two fora "would appear to be inconsistent with the economic benefits of arbitration on which the parties relied in agreeing to arbitration."

We disagree with the proposition that our interpretation of the arbitration clause should be controlled by efficiency concerns. There are two independent reasons why we cannot impose upon the arbitration clause an interpretation in the interests of confirming it to an imputed notion of efficiency. We now discuss those two reasons.

### 1.

First, the policy favoring arbitration "is at bottom a policy guaranteeing the enforcement of private contractual arrangements." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625 (1985). We must enforce the parties' agreement according to its terms, even if the result is inefficient. *See Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 217-21 (1985) (arbitration required even when it results in inefficient procedures: "The legislative history of the Act establishes that the purpose behind its passage was to ensure judicial enforcement of privately made agreements to arbitrate. We therefore reject the suggestion that the overriding goal of the Arbitration Act was to promote the expeditious resolution of claims"). It is true that it may be inefficient to have multiple arbitrations regarding the parties' dealings in different fora before different arbitrators. *See China Nat'l*, 379 F.3d at 802. But we cannot override the express terms of the parties' agreement, because parties are free to agree to inefficient arbitration procedures. *See Byrd*, 470 U.S. at 221 ("we rigorously enforce agreements to arbitrate, even if the result is 'piecemeal' litigation"); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 20 (1983) (compelling arbitration where it would result in bifurcated proceedings). Thus, the "efficiency" position adopted by the arbitrator and the dissent is inconsistent with the true basis of the "federal policy favoring arbitration."

In a similar vein, RAE asserts that we should "construe arbitral authority broadly to comport with the enforcement-facilitating thrust of the Convention and the policy favoring arbitration." *See Parsons-Jurden*, 820 F.2d at 1534. While we recognize that the New York Convention was enacted to promote the enforceability of international arbitration agreements, that Convention, like the federal policy favoring arbitration more generally, favors enforcement of arbitration clauses *according to the intent of the contracting parties.* The New York Convention "recognizes the central role of the parties in fashioning the arbitration procedure, and provides sanctions for failure to adhere to the agreed procedures." Born at 44; *see also Rhone Mediterranee Compagnia Francese Di Assicurazioni E Riassicurazoni v. Lauro*, 712 F.2d 50, 54 (3d Cir. 1983).

**[10]** We cannot, therefore, "overlook agreed-upon arbitral procedures" in favor of the *enforcement* of an arbitration award. *Encyclopaedia Universalis*, 403 F.3d at 91. We also cannot utilize the federal policy favoring arbitration to justify the imposition of general procedural rules at the expense of the parties' agreement. *See Cargill Rice, Inc. v. Empresa Nicaraguense Dealimentos Basicos*, 25 F.3d 223, 225-26 (4th Cir. 1994); *Szuts v. Dean Witter Reynolds, Inc.*, 931 F.2d 830, 831 (11th Cir. 1991). Here, the parties expressly agreed to submit disputes to arbitration at "defendant's [site]." The parties' agreement effectively removed the decision regarding forum from the procedural decisions delegated to the arbitrator. The arbitrator could not override the parties' express agreement in favor of general procedural rules. Indeed, adherence to the parties' agreed-upon procedures is regularly enforced, such as where relevant to the choice of forum of arbitration, *see Bear, Stearns & Co., Inc. v. Bennett*, 938 F.2d 31, 32 (2d Cir. 1991); *National Iranian Oil Co. v. Ashland Oil, Inc.*, 817 F.2d 326, 332 (5th Cir. 1987), or the appointment of arbitrators, *see Universal Reinsurance Corp. v. Allstate Insurance Co.*, 16 F.3d 125, 128 (7th Cir. 1993); *Avis*

*Rent A Car System, Inc. v. Garage Employees Union*, 791 F.2d 22, 24 (2d Cir. 1986).

**2.**

Second, the policy favoring arbitration "applies with special force in the field of international commerce." *Mitsubishi Motors*, 473 U.S. at 631. The Court has recognized the importance of forum-selection clauses to international trade: "agreeing in advance on a forum acceptable to both parties is an indispensable element in international trade, commerce, and contracting," *M/S Bremen*, 407 U.S. at 13-14, and that a choice of forum is "an almost indispensable precondition to achievement of the orderliness and predictability essential to any international business transaction," *Scherk*, 417 U.S. at 516.

There is no sound basis for imputing a concern for efficiency to the parties in this case. We cannot assume that the parties' agreement to arbitrate was motivated by a desire for efficiency alone, or even that efficiency was a central motivation for their arbitration agreement. Indeed, there are many reasons why parties might agree to private dispute resolution; many of these reasons have nothing to do with efficiency. Non-efficiency justifications for arbitration are especially important in the realm of international contracting. For example, international arbitration is often preferred as a method to obtain a neutral decision maker, and to "obviate[ ] the danger that a dispute under the agreement might be submitted to a forum hostile to the interests of one of the parties or unfamiliar with the problem area involved." *Scherk*, 417 U.S. at 516; *see also Mitsubishi Motors*, 473 U.S. at 631; *M/S Bremen*, 407 U.S. at 13; Born at 5. That appears to have been a critical concern to the contracting parties here: forum selection restricted to the defendants' site. That language makes sense only by a joint view of the parties that neither will be required to defend itself except in a proceeding at its home forum.

**[11]** In sum, although we recognize that parties often choose arbitration for sake of efficiency, we cannot impute such a motivation to the parties here, and we cannot and the arbitrator cannot rewrite the forum selection clause to suit a personal view of the virtue of efficiency.

## C.

*China National* is not contrary to our holding in the present case. 379 F.3d 796. There, the arbitration provision at issue submitted disputes to arbitration by the China International Economic and Trade Arbitration Commission (CIETAC), pursuant to CIETAC arbitration rules, to be conducted in Beijing, Shenzen, or Shanghai, as determined by the claimant. Apex commenced arbitration proceedings against China National in Shanghai. A few days later, China National commenced a separate arbitration in Beijing. Apex objected to China National's arbitration application because it concerned the same purchase orders as its own arbitration application. CIETAC allowed the arbitrations to proceed separately, however. China National obtained a favorable award in the Beijing arbitration, and obtained confirmation of that award. Apex appealed, arguing that the arbitral procedure did not comply with the parties' agreement.

We concluded that the maintenance of multiple arbitrations was not inconsistent with the arbitration agreement. The agreement specified three acceptable venues — Beijing, Shenzen, or Shanghai — and made the selection the *claimant's option*. "Nothing in the parties' purchase orders either specifically designated Shanghai as the only appropriate arbitral forum or articulated a rule of decision for determining the appropriate forum." *Id.* at 800. Further, the arbitration agreement incorporated CIETAC rules, "[t]hus, CIETAC did not trump specific terms of the parties' purchase orders by turning to its own rules because the arbitral clause did not resolve the parties' dispute itself." *Id.* at 801.

**[12]** *China National* thus involved an arbitration agreement dissimilar to what we consider here. In *China National*, the arbitration provision provided three options for forum to be selected by the claimant. This provision did not constitute a mandatory forum selection clause. Here, in contrast, there is no ambiguity in the agreement: it requires arbitration at the defendant's site. Further, the parties in *China National* adopted CIETAC rules in their arbitration agreement; CIETAC did not trump the specific terms of the parties' agreement. *Cf. Cargill Rice*, 25 F.3d at 225-26. Here, the parties made no similar choice of applicable procedures. Thus, the arbitrator's reference to compulsory counterclaim procedures went outside of the parties' agreement, and violated the specific agreement of the parties.

The dissent argues that our holding is inconsistent with *China National*. The dissent's position is, at base, that "[t]he parties' disagreement in this case over who is a 'defendant' — a respondent to an initial claim only, or *both* an initial respondent *and* a party who responds to counterclaims — matches the *China National* debate over the meaning of the contractual word 'claimant.' " The dissent reasons that "the arbitration clause here is equally 'indeterminate' with respect to the dispositive interpretive question of the precise meaning of 'defendant.' "

In our view, however, the dissent focuses on an inapposite aspect of *China National*. Apex argued that CIETAC had disregarded the parties' arbitration clause by *permitting* separate, parallel arbitrations to proceed. Apex, therefore, had to establish that the parties' arbitration agreement permitted proceedings in *only* one forum "and not in multiple venues." 379 F.3d at 799. As we have described, the agreement in *China National* gave the claimant the option to select one of three fora: Beijing, Shenzen, or Shanghai. Because the arbitration agreement provided the choice of three fora at claimant's option, "[n]othing in the parties' purchase orders either specifically designated Shanghai as the only appropriate arbitral

forum or articulated a rule of decision for determining the appropriate forum. Apex [was] mistaken in its claim that the arbitration clause was sufficiently specific that CIETAC could determine the arbitral forum without reference to its arbitral rules." *Id.* at 800. Further, we determined that the use of the term "claimant" did not limit arbitration proceedings to the first-chosen forum. Instead, "the clause does not define 'Claimant' but leaves it open as a variable term (*i.e.* either party could be a claimant)." *Id.* at 801. Thus, the term "claimant" did not designate the forum of arbitration in light of the fact that the clause allowed each "claimant" to elect the forum of arbitration. We stated that the arbitration clause — *because it provided three potential fora for each claimant's election* — did not resolve the question of forum.

The dissent focuses on the insufficiency of the term "claimant" to resolve the dispute at issue in *China National*; but that term was insufficient to resolve the dispute *in light of* the context of the arbitration agreement involved. Rather than being contradictory to our holding, we view *China National's* discussion of "claimant" to be consistent with our conclusion. In *China National*, as in this case, two parties purported to be claimants. By extension, in this case, there are two claimants and two defendants. The arbitration clause at issue *required* arbitration at the "defendant's [site]." In light of the mandatory forum selection clause, there is no ambiguity. This case is distinct from *China National*.

### D.

**[13]** We hold that Polimaster has established a defense under the New York Convention. Under the New York Convention, we may refuse enforcement of an award if it is the result of procedures that are contrary to the parties' agreement. Here, the parties agreed to an arbitration clause that requires disputes to be arbitrated where the defendant is located; each party should be held to the contractual language requiring arbitration of disputes in the location of the party

against whom relief is sought. The procedures used in the arbitration of "counterclaims" were "not in accordance with the agreement." The district court erred in confirming the arbitration award for RAE.

## IV.

On February 25, 2008, the district court issued an order confirming the arbitration award, but did not issue a judgment. Polimaster's appeal of that order is discussed in Part III. On June 5, 2008, RAE filed a motion in our court, asking that, pursuant to Federal Rules of Civil Procedure 60(a), the district court be allowed to make corrections to the order. We denied that motion, but following a request from the district court for leave to fix "an omission and an error" in the February 25, 2008 Order, and a request from RAE that we reconsider our earlier denial of the Rule 60(a) motion, we granted RAE's motion for reconsideration and "motion for limited remand" to allow RAE to file a Rule 60(a) motion in district court to correct the clerical errors identified by the district court. In the district court, RAE then filed its Rule 60(a) motion; on January 23, 2009, the district court granted the motion and filed an amended order and a judgment, this time including in its relief to RAE pre- and post-judgment interest. Polimaster now appeals from that judgment (case No. 09-15369), arguing that the judgment's inclusion of pre- and post-judgment interest exceeded the scope of our limited mandate.

We need not reach the issue of whether the district court erred in this respect, because we hold that the district court's judgment must be vacated for the reasons set forth in Part III of this opinion. We therefore remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

CLIFTON, Circuit Judge, dissenting:

I respectfully dissent. I believe that the majority opinion has gone astray in two ways.

First, it fails to recognize that the relevant language in the parties' arbitration agreement is ambiguous. The arbitrator and the district judge both concluded that the language is ambiguous, and I agree with them. The arbitrator also concluded that the language is better interpreted differently than the majority has read it here, and I tend to agree with the arbitrator's specific interpretation, as well. The two judges making up the majority insist, nonetheless, that the language can have but one reasonable interpretation, an interpretation different from that reached by the arbitrator. In light of the contrary views of the neutral arbitrator, the district court, and me, the majority's conclusion that the language is unambiguous flies in the face of a strong headwind, and the reasoning offered by the majority to support its conclusion is unpersuasive.

Second, as a result of its refusal to recognize the ambiguity of the contractual language, the majority opinion usurps the arbitrator's authority to interpret an ambiguous contractual term, in conflict with our decision in *China National Metal Products Import/Export Co. v. Apex Digital, Inc.*, 379 F.3d 796 (9th Cir. 2004).

## 1. The ambiguity of the relevant language

The problem posed by this case is how, after an arbitration between the parties has been initiated, to deal with a claim back by the respondent against the original claimant. In federal court, we call this type of claim a "counterclaim." *See* Fed. R. Civ. P. 13. The parties advocate different solutions to the problem based upon different interpretations of the arbitration term in the contract: "In case of failure to settle the

mentioned disputes by means of negotiations they should be settled by means of arbitration at the defendant's side [site]."

RAE Systems maintains that the word "defendant" refers to the initial respondent, the party against which the first claim is brought, such that any subsequent counterclaim can be brought in the same arbitration proceeding, even though that proceeding is not located at the site of the target of the counterclaim. Polimaster, on the other hand, contends that both the initial respondent and the counter-respondent are "defendant[s]" within the meaning of the contractual term, requiring the original respondent to initiate and pursue a separate arbitral proceeding at the site of the counter-respondent in order to pursue a counterclaim.

The majority opinion accepts Polimaster's multiple-defendant, multiple-arbitration interpretation as the right one. It further decides that this interpretation is so clearly correct that the arbitration clause is not ambiguous. The majority does not satisfactorily explain, however, why RAE's alternative interpretation is not also a reasonable reading of the arbitration clause. "[A] contract is ambiguous if reasonable people could find its terms susceptible to more than one interpretation." *Doe 1 v. AOL LLC*, 552 F.3d 1077, 1081 (9th Cir. 2009) (internal quotation marks omitted). The arbitration clause is susceptible to more than one reasonable interpretation, as the arbitrator and the district court concluded. The language is ambiguous and should be recognized as such.

The majority argues that its reading is the only reasonable one based on the notion that any party who defends against "any dispute where another party seeks damages or some other form of relief against him" is necessarily a "defendant." Maj. op. at 16559. But none of the sources the majority cites, at 16562-63, establish as a matter of terminology that the term "defendant" must be used only as the majority supposes.[1] At

---

[1] *See, e.g.*, *Rainbow Mgmt. Group, Ltd. v. Atlantis Submarines Haw., L.P.*, 158 F.R.D. 656, 659 (D. Haw. 1994) (holding that "[c]o-parties

least two of the cited sources actually support the opposite conclusion: that one might use the term "defendant," especially with the definite article and without a preceding adjective, to distinguish the original defending party from the party initially on the offensive. For example, Moore's Federal Practice, upon which the majority relies, refers to "the defendant" in precisely this way. *See* Daniel Coquilette et al., eds., Moore's Federal Practice § 13.90[2] (3d ed. 2010) (especially the text following n.9 and preceding n.17) (using "the plaintiff" and "the defendant" to designate substantive sides in litigation, in contrast to the term "defending party," which refers to either side whenever it defends against an affirmative claim).**[2]** The plaintiff, under this terminology, might later become a "counterclaim defendant" or a "crossclaim defendant" as well, but such additional designations, despite including the word "defendant," would not transform that party into "the defendant" in the contemplated sense—a shorthand for a particular side in the litigation.

To the extent that any answer can be gleaned from the language used in the agreement, I think the language cuts slightly against the majority opinion's interpretation. Look carefully at the sentence in question: "In case of failure to settle the mentioned disputes by means of negotiations they should be set-

---

become *opposing parties* [emphasis added] within the meaning of Fed. R. Civ. P. 13(a) after one such party pleads an initial cross-claim against the other," with no discussion of whether an "opposing party" must be deemed a "defendant"); *In re Concept Clubs, Inc.*, 154 B.R. 581, 586 n.4 (distinguishing between a counterclaim and a setoff or recoupment, with no mention of whether a counterclaim makes the party that opposes it a "defendant"); *Earle M. Jorgenson Co. v. T.I. U.S., Ltd.*, 133 F.R.D. 472, 475 (E.D. Pa. 1991) (dealing, like *In re Concept Clubs*, with the "opposing party" issue, without endorsing any theory of how the term "defendant" can or must be used).

**[2]***See also FDIC v. F.S.S.S.*, 829 F. Supp. 317, 322 n.11 (D. Alaska 1993) (also cited by the majority) (describing a counterclaim brought by "Defendants[ ]" against "the plaintiff").

tled by means of arbitration at the defendant's side." The word "disputes" is plural, but the words "defendant" and "side" (or "site") are singular. The parties anticipated that there could be multiple disagreements, yet "the defendant's site" refers to only one location. The arbitration clause does not say "defendants' sites." Of course, I need not be as sure of this interpretation as the majority must be of its own, because I do not contend that only this reading is reasonable. To establish that the language is ambiguous, it is enough to demonstrate that a reasonable interpretation other than the majority's exists, and the language of the arbitration clause is more than adequate for that purpose.

The reasoning provided by the arbitrator to support his conclusion that the existing arbitration should encompass counterclaims as well was logical. The arbitrator rejected the interpretation embraced by the majority—that arbitration of a counterclaim must be conducted in a separate proceeding at the counter-respondent's site—because that would represent an inefficient way to resolve disputes. Parties contractually adopting arbitration as the method for resolving disputes commonly do so to achieve efficiency. It is logical to reason that such parties do not intend inefficient results. See Restatement (Second) of Contracts § 202(1) (1981) ("Words and other conduct are interpreted in the light of all the circumstances."); *id.* cmt. b ("The circumstances for this purpose include the entire situation, as it appeared to the parties.").

In addition, the arbitrator recognized that it is not a novel or obscure practice to resolve all claims, including counterclaims, in a single proceeding that has already commenced. The arbitrator here specifically referenced the treatment of counterclaims in the Federal Rules of Civil Procedure, the California Rules of Civil Procedure, and the rules of the arbitration forum agreed upon by the parties, JAMS. The prosecution of counterclaims in the same proceeding is broadly recognized in international arbitration. Prominent international arbitration organizations address counterclaims explic-

itly in their rules. *See, e.g.*, International Chamber of Commerce Rules of Arbitration art. 5; London Court of International Arbitration Rules art. 2.1(b); German Institute of Arbitration Rules § 10; United Nations Commission on International Trade Law Arbitration Rules art. 19.

Considering the context in which the parties made their agreement does not improperly assume any conclusion or wrongly impute any particular motivation to the parties. It merely recognizes one good reason the parties may have intended to agree to something different from the interpretation of the arbitration clause that the majority espouses: because the majority's interpretation ignores both the common desire for efficiency and the widespread procedural practice of litigating counterclaims in the same proceeding.[3] Given this context, it is not so clear to me, let alone unambiguously clear from the words of the arbitration clause, that the parties agreed to require piecemeal litigation. The majority opinion does not persuasively explain why we should conclude that they did.

The majority opinion's arguments are, in reality, circular— the arguments for its preferred reading of the arbitration clause assume the correctness of that reading. For example, the majority opinion asserts, at 16562, that "the parties' clause was adequate to express their intent . . . to provide for separate arbitrations at the defendant's site." I agree that if the parties intended separate arbitrations at the sites of each defendant or counterclaim defendant, then that is how the agreement should be interpreted and applied. But the inference that the parties intended the interpretation favored by the majority rests on nothing other than the majority's own inter-

---

[3]We need not (indeed, should not, in determining whether a contract is ambiguous) seek to establish whether the parties subjectively took efficiency concerns or the concept of counterclaims into account. The relevant point is that the influence of these considerations as background to the agreement makes an alternate reading of the arbitration clause reasonable.

pretation of the contractual language. Nothing else is cited by the majority opinion to support its assertion that the parties intended that result, nor is any persuasive explanation given to counter the reasoning of the arbitrator that reached a different conclusion.

Similarly, the majority opinion asserts, at 16562, that this dissent rests on an "assumption" that counterclaims will be joined into an existing proceeding, and, at 16562, that the relevant language is clear because there was "no reason to require the parties to include contractual language specifically defeating or negating the joinder of claims." But the parties obviously recognized the possibility of conflicting claims. The possibility of combining those claims into a single proceeding was by no means unknown. As noted above, that is the result suggested by both rules of courts and rules of international arbitration organizations. It is no less an "assumption" to conclude that, in the absence of a contractual agreement, multiple claims should be litigated piecemeal in separate arbitrations.

In the end, the reasoning offered by the majority to demonstrate that the agreement unambiguously provided for piecemeal arbitrations rests on nothing more than the majority's own assumption that its interpretation of the arbitration clause is correct. In the face of contrary conclusions by the arbitrator, the district court, and this dissent, that is much too thin a reed to support the majority's conclusion that the relevant language is unambiguous.

## 2.   The *China National* decision

Our decision in *China National Metal Products Import/Export Co. v. Apex Digital, Inc.*, 379 F.3d 796 (9th Cir. 2004), requires that we respect the arbitrator's interpretation of an ambiguous contractual provision. Indeed, it also provides further support for the conclusion that the arbitration clause here is ambiguous.

The arbitration clause in *China National* provided that all disputes arising from or in connection with the contract would be submitted to a specified forum, the China International Economic and Trade Arbitration Commission ("CIETAC"), for arbitration in Beijing, Shenzhen, or Shanghai, "at the Claimant's option." *China National*, 379 F.3d at 800. Just as the parties here argue over who qualifies as "defendant," the parties in *China National* debated who qualified as "claimant" under their arbitration clause. At stake was the right to determine where arbitration would take place.

Apex first commenced arbitration against China National in Shanghai. Days later, China National brought its own claims against Apex in a separate arbitration in Beijing. *Id.* at 798-99. Apex argued that only it, as the party that first initiated arbitration, was a "claimant," and that its selection of Shanghai as the arbitral forum required China National to bring its claims, which arose largely out of the same set of facts, as counterclaims in the ongoing Shanghai arbitration. *Id.* at 801. China National countered that "[i]t too was a rightful claimant with respect to its claims against Apex" and that it therefore retained the right, under the arbitration clause, "to pick a forum for its own claims." *Id.* After considering its own rules, CIETAC decided in favor of China National's position and let the claims proceed separately before separate panels. The Beijing panel entered an award in favor of China National and against Apex. China National brought an action in federal district court to confirm the Beijing panel's award, the court confirmed the award, and Apex appealed, arguing that only one proceeding, the Shanghai arbitration, should have taken place. We rejected the challenge and affirmed the confirmation order. *Id.* at 797-98.

We held that "[b]oth positions are arguable, and in the face of an assertion that there can be two claimants, the text of the arbitration clause alone is indeterminate and does not resolve the matter." *Id.* at 801. The parties' disagreement in this case over who is a "defendant"—a respondent to an initial claim

only, or *both* an initial respondent *and* a party who responds to counterclaims—matches the *China National* debate over the meaning of the contractual term "claimant." *See id.* (describing how the parties argued "claimant" should be interpreted). And the arbitration clause here is equally "indeterminate" with respect to the dispositive interpretive question of the precise meaning of "defendant."

Because *China National* dealt with an analogous contractual ambiguity, it controls our decision here and requires us to affirm. *China National* established that an arbitrator does not impermissibly "trump specific terms of the parties' [agreement] by turning to its own rules" when, as here, an "arbitral clause [does] not resolve the parties' dispute itself."[4] *Id.* In our case the arbitrator applied JAMS rules and the Federal and California Rules of Civil Procedure because the parties' agreement left a dispute about counterclaims unresolved. The application of extrinsic procedural rules did not contradict the parties' agreement, but merely supplemented it. The arbitrator thus did not violate Article V, section 1(d) of the New York Convention, and the judgment of the district court confirming the arbitration award should be affirmed.

The majority opinion tries to distinguish *China National* on several grounds, but none are persuasive. It points out that "the parties in *China National* adopted CIETAC rules in their arbitration agreement," so the gap-filling application of those rules by CIETAC "did not trump the specific terms of the parties' agreement." Maj. op. at 16569; *see China National*, 379 F.3d at 801. But it was the arbitration panel, not our court, that interpreted CIETAC rules and made the decision as to where the arbitration could proceed. The majority opinion in

---

[4]None of the parties' contracts defined "defendant's site" or "defendant's side." The controversial term in *China National*, "claimant," was similarly undefined: the arbitration clause "[did] not define 'Claimant' but [left] it open as a variable term (*i.e.*, either party could be a claimant)." *China National*, 379 F.3d at 801.

this case overrides the arbitrator's decision. While the parties in this case did not specify a choice of forum or a choice of procedural law to address issues their arbitration clause did not resolve, they subsequently did expressly agree on JAMS as a forum.

Moreover, while the election of default procedural rules in *China National* may have strengthened the argument that applying those rules did not violate the parties' agreement, a choice of law was not necessary to *China National*'s result. "CIETAC did not trump specific terms of the parties' purchase orders by turning to its own rules *because the arbitral clause did not resolve the parties' dispute itself*," 379 F.3d at 801 (emphasis added), not because the CIETAC rules used to fill a gap in the arbitration clause were incorporated by reference into the contract. Rules entirely extrinsic to an agreement, such as the JAMS rules and Federal and California Rules of Civil Procedure applied in this case, do not automatically conflict with that agreement. *China National* makes clear that it is the presence of a gap in an arbitration clause, not the specification of default rules for filling such a gap, that makes an arbitrator's reference to extrinsic rules appropriate. A gap—that is, a dispute between the parties that "the text of the arbitration clause alone" does not resolve—exists as much in this case as it did in *China National*. Reference to outside procedural rules was appropriate here, even though the rules employed were not specified in advance by the parties.

The majority opinion also attempts to differentiate this case from *China National* by highlighting the fact that the arbitration clause at issue here, once properly interpreted, mandates a particular forum ("the defendant's side"), while the clause in *China National* gave one party a choice among three Chinese cities. Maj. op. at 16569. That distinction is beside the point. The parties debated the meaning of "claimant" in *China National* because its definition determined which party got to choose among Beijing, Shenzhen, and Shanghai. The winner of the interpretive debate received the right to select a city

instead of, as in this case, a predetermined forum that the victorious party would prefer. But that detail does not disturb the parallel contractual analysis that underlies the two cases. Both cases are fundamentally about how contractual terms, "claimant" and "defendant," respectively, should be interpreted when the contracts themselves do not resolve the parties' disputes.

Because I conclude that the judgment on the merits should be affirmed, I would reach the issue of whether the district court exceeded the scope of our earlier limited remand to correct its failure to enter a judgment. I would affirm the district court's belatedly entered judgment. Because the court's oversight was its failure to enter any judgment at all, it was empowered to correct its mistake by entering a judgment that included any relief, including pre- and post-judgment interest, that could have been included in the judgment in the first instance. A court is allowed, under Federal Rule of Civil Procedure 60(a), to make corrections to effectuate what it "originally intended to do." *Robi v. Five Platters, Inc.*, 918 F.2d 1439, 1445 (9th Cir. 1990).

I would affirm.